**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 28, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

BROKERS' CHOICE OF AMERICA,
INC.; TYRONE M. CLARK,

     Plaintiffs - Appellants,

v.

NBC UNIVERSAL, INC.; GENERAL
ELECTRIC CO.; CHRIS HANSEN;
STEVEN FOX ECKERT; MARIE
THERESA AMOREBIETA,

     Defendants - Appellees.

No. 15-1386

_____

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. No. 1:09-CV-00717-CMA-NYW)**
_____

G. Stephen Long, Jones & Keller, P.C., Denver, Colorado (John J. Walsh, Carter Ledyard
& Milburn LLP, New York, New York, on the briefs; Nicole A. Westbrook and Lidiana
Rios, Jones & Keller, P.C., Denver, Colorado, with him on the briefs), appearing for
Appellants.

Thomas B. Kelley, Levine Sullivan Koch & Schulz, L.L.P., Denver, Colorado; (Gayle C.
Sproul, Levine & Associates, L.L.P., Philadelphia, Pennsylvania, with him on the brief),
appearing for Appellees.
_____

Before **MATHESON**, **BACHARACH**, and **MORITZ**, Circuit Judges.
_____

**MATHESON**, Circuit Judge.
_____

# TABLE OF CONTENTS

I.   BACKGROUND.................................................................................................1

   A. Factual Background ......................................................................................1

     1.  The BCA Seminar and NBC's Secret Recording ............................................1

     2.  The *Dateline* Episode .................................................................................3

   B. Procedural Background.................................................................................7

     1.  District Court's Dismissal of Original Complaint and Stay of Discovery .........7

     2.  *Brokers' Choice I:* District Court's Dismissal of First Amended Complaint ....8

       a.  BCA's amended complaint .......................................................................8

       b.  BCA's motion for production of the seminar recording...............................10

       c.  NBC's motion to dismiss........................................................................10

     3.  *Brokers' Choice II*:  Tenth Circuit's Partial Reversal ....................................11

     4.  *Brokers' Choice III:*  District Court's Dismissal of the Amended Complaint Based on Comparison of the Episode with the Seminar Recording.................13

       a.  Scare tactics.........................................................................................15

       b.  Suitability of annuities...........................................................................16

       c.  Misleading credentials ...........................................................................17

II.  BCA'S PROCEDURAL OBJECTIONS ............................................................17

   A. Law of the Case ........................................................................................18

     1.  Legal Background.....................................................................................18

     2.  Analysis...................................................................................................20

   B. Federal Rule of Civil Procedure 12(g)(2)....................................................22

     1.  Legal Background.....................................................................................23

     2.  Analysis...................................................................................................24

   C. Consideration as a Motion to Dismiss.........................................................25

     1.  Legal Background.....................................................................................25

     2.  Analysis...................................................................................................27

III. MERITS OF THE DISTRICT COURT'S DISMISSAL.....................................28

   A. Standard of Review and Analytical Considerations .......................................29

     1.  Standard of Review and Sufficiency of a Complaint ....................................29

    2.  Effect of an Exhibit to a Complaint ................................................30

  B.  Legal Background...........................................................................31

    1.  Development of Defamation Law ...................................................31

    2.  Material Falsity.............................................................................33

      a.  Materiality ................................................................................33

      b.  Words out of context ................................................................35

      c.  Omitting favorable information .................................................36

      d.  Context as a whole...................................................................37

    3.  The First Amendment and Colorado Defamation Law ..................37

    4.  Material Falsity and Substantial Truth..........................................39

  C.  Analysis ........................................................................................43

    1.  Purpose of the Seminar .................................................................45

    2.  Comparing the Gist of the Episode and the Seminar......................48

      a.  "Scare seniors" ........................................................................48

        i.   The episode and the seminar.................................................48

        ii.  BCA's arguments ...............................................................54

        iii. Conclusion.........................................................................56

      b.  "Mislead seniors" ....................................................................56

        i.   The episode and the seminar.................................................56

          1)  Inflate credentials .........................................................57

          2)  Deflect annuity criticisms...............................................61

          3)  Attorney General Swanson's liquidity comment ...................64

        ii.  BCA's arguments ...............................................................67

        iii. Conclusion.........................................................................70

      c.  "Unsuitable insurance products"...............................................70

        i.   The episode and the seminar.................................................71

        ii.  BCA's arguments ...............................................................74

          1)  Addressing annuity criticisms..........................................74

          2)  Suitability references.......................................................77

          3)  Teaching to preserve assets .............................................78

        iii. Conclusion.........................................................................79

EPISODE GIST WAS NOT MATERIALLY FALSE ................................................80

3. Analysis of *Dateline* Episode Statements .......................................................80

   a. Statement 1 ...............................................................................81

   b. Statements 2 and 3 ......................................................................82

   c. Statement 4 ...............................................................................83

   d. Statement 5 ...............................................................................85

   e. Statement 6 ...............................................................................86

   f. Statement 7 ...............................................................................87

   g. Statement 8 ...............................................................................88

   h. Statements 9 and 10 ....................................................................90

   i. Statement 11 ..............................................................................95

   j. Statement 12 ..............................................................................97

IV. CONCLUSION ...........................................................................................98

In 2007, undercover producers from NBC Universal, Inc., attended and surreptitiously recorded a seminar presented by Brokers' Choice of America to teach insurance agents how to sell annuities to seniors. NBC used excerpts and information from the seminar in a *Dateline NBC* episode. Brokers' Choice and its founder Tyrone Clark (collectively, "BCA") sued for defamation.

Now before this court for a second time, this appeal concerns the district court's dismissal of the amended complaint after it compared the seminar recording with the episode and concluded the *Dateline* program was substantially true. Exercising jurisdiction under 28 U.S.C. § 1291, and having conducted the same comparison, we affirm because the *Dateline* episode was not materially false.

## I. BACKGROUND

### A. *Factual Background*

Three previous decisions in this case detail the factual and procedural history: *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, No. 09-CV-00717-CMA-BNB, 2011 WL 97236 (D. Colo. Jan. 11, 2011) (unpublished) ("*Brokers' Choice I*"); *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 757 F.3d 1125 (10th Cir. 2014) ("*Brokers' Choice II*"); and *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 138 F. Supp. 3d 1191 (D. Colo. 2015) ("*Brokers' Choice III*"). We outline the facts relevant to this appeal.

### 1. The BCA Seminar and NBC's Secret Recording

Brokers' Choice is an independent marketing organization in the insurance industry. Independent marketing organizations act on behalf of insurance companies

to recruit independent licensed insurance agents to sell insurance products, such as annuities.[1]  As part of its marketing and education efforts, BCA offered classes to agents, including "Annuity University," a two-day seminar taught primarily by Mr. Clark but also including other speakers.  According to BCA, Annuity University "assist[s] insurance producers to understand the many and varied features of the annuity products they market to consumers for suitable fit," and teaches attendees about the "suitability of annuity products for various potential purchasers."  Am. Compl. at 7, ¶ 24, 25.[2]  Attendees must be licensed insurance producers.

NBC broadcasted a "Tricks of the Trade" series on its *Dateline* show.  A 2008 episode investigated annuity sales to seniors.  NBC partnered with the Alabama Annuities Task Force, which included the Alabama Department of Insurance, the Alabama Securities Commission, and the Alabama Attorney General's office.  The

---

[1] An annuity is "a contract between [an investor] and an insurance company that is designed to meet retirement and other long-range goals, under which [the investor] make[s] a lump-sum payment or series of payments.  In return, the insurer agrees to make periodic payments to [the investor] beginning immediately or at some future date."  Securities and Exchange Commission ("SEC"), *Annuities*, https://perma.cc/5MP5-QDVA.

[2] Record citations in this opinion reference five key sources:  the amended complaint (App. Vol. 1 at 19-66); the video of the *Dateline* episode provided by NBC (Supp. App. at 1); the transcript of the *Dateline* episode provided by BCA (Dist. Ct. Doc. 130-7); the transcripts of the two-day Annuity University seminar submitted by BCA (Dist. Ct. Doc. 130-3 and Dist. Ct. Doc. 130-4) and supplemented by transcripts in NBC's supplemental appendix (Supp. App. at 100-1789); and the transcript of an exchange between an Annuity University presenter and the *Dateline* producers submitted by BCA (Dist. Ct. Doc. 130-5).  For clarity, we cite directly to these sources rather than their locations in the parties' appendices.  The seminar recording was submitted to this court by NBC in hard copy DVDs with its supplemental appendix.  *See* Supp. App. at i.

Department issued fake insurance licenses to two of *Dateline*'s producers, Defendants-Appellees Steven Eckert and Marie Amorbieta, which enabled them to attend the Annuity University seminar held at BCA's Colorado headquarters on October 25-26, 2007, and surreptitiously record the lectures.[3]

## 2. The *Dateline* Episode

The *Dateline* episode aired in April 2008. A transcript of the episode is attached as an appendix to this opinion.[4]

The episode began with an interview of a senior citizen who claimed he had lost money by investing in an annuity because he was not told (1) the annuity "would lock up most of his money for more than a decade, which is longer than he might live" and (2) withdrawing his money early would result in "stiff surrender penalties."[5] *Dateline* Tr. at 1. The senior explained that when his wife became ill, he needed to withdraw his cash early. *Id*. The money he lost because of his surrender penalty "forced him to sell his home" and to choose between buying "[p]ills or food." *Id*. at 1-2.

---

[3] The NBC producers used two devices to record the seminar. According to labels on the seminar recording DVDs, one device was attached to a producer's glasses and the other to a producer's purse. *See* Supp. App. at i.

[4] We use the episode transcript attached as Exhibit G to BCA's amended complaint. Dist. Ct. Doc. 39-7 ("*Dateline* Tr."). NBC provided the same transcript in its supplemental appendix on appeal. Supp. App. Vol. 1 at 60-78.

[5] The SEC describes surrender charges as: "If [an investor] withdraw[s] [their] money early from an annuity, [the investor] may pay substantial surrender charges to the insurance company, as well as tax penalties." SEC, *Annuities*, https://perma.cc/5MP5-QDVA.

Defendant-Appellee Chris Hansen, an on-screen *Dateline* reporter, then previewed the rest of the episode, saying it would "go behind the scenes" to expose "how some insurance agents can take advantage" of seniors. *Id.* at 2. The episode would "uncover the techniques [insurance agents] use: inside sales meetings—where we catch the questionable pitches; inside training sessions—where we discover agents being taught to scare seniors; and, finally, inside senior[s'] homes to reveal the tricks some agents use to puff their credentials to make a sale." *Id.* Mr. Hansen narrated the rest of the episode, which alternated between hidden camera footage and in-studio commentary from law enforcement officials. The hidden camera footage came from three sources: (1) a sales seminar hosted by an insurance agent to sell annuities to prospective clients; (2) the two-day Annuity University training session for insurance agents; and (3) a sting house set up by *Dateline* where agents attempted to sell annuities to seniors recruited by *Dateline* to pose as potential clients.

The first half of the episode presented segments unrelated to BCA. The themes of this part did, however, overlap with the later Annuity University-related segments. The first half showed undercover footage of an insurance salesman giving a free "informational seminar" with potential clients. *Id.* at 2-4. The segment interjected in-studio commentary from Mr. Hansen and the Director of the Alabama Securities Commission, who pointed out the "scare tactics" and "big promise[s]" the salesman used to sell annuities. *Id.* Next, the episode showed hidden camera footage of agents making sales pitches to seniors at a sting house set up by *Dateline*. *Id.* at 4.

The agents either did not mention, or avoided explanation of, surrender penalties. *Id.* at 4-7.

About 29 minutes into the hour-long program, Mr. Hansen transitioned to the portion on Annuity University. Mr. Hansen commented that the agents portrayed in the episode thus far "seem[ed] awfully slick" and asked: "How did they get so good?" *Id.* at 7. He said viewers were about to see "a school where, authorities say, insurance salesmen are being taught questionable tools of the trade," but noted that NBC did not know "whether the salesmen we've met so far studied here." *Id.*

The episode then excerpted clips of hidden camera footage from the two-day Annuity University seminar and interspersed commentary from Mr. Hansen and Minnesota Attorney General Lori Swanson. *Id.* at 7-10. The seminar footage showed Mr. Clark teaching attendees to sell annuities by using, in Mr. Hansen's words, "scare tactics" to "make [seniors] worry," and promising seniors "easy access to their money." *Id.* at 8-9. During this portrayal, captions with words such as "Scare Tactics" and "Nursing Home Fears" were superimposed on the screen. *Dateline* episode at 30:30-30:32; 31:07-31:09. The episode also described Annuity University as teaching agents to "puff up their credentials and mislead [seniors] about who the[] [salesmen] really are." *Dateline* Tr. at 9. It showed hidden camera footage of author and Annuity University presenter Richard Duff explaining to agents that they could pay to have their names listed on the front of his book and write the book's first chapter—about five to seven pages. *Id.* It stated that an Annuity University ad stated that agents could be the "author of a book called 'Alligator

Proofing Your Estate,'" and stated that *Dateline* found copies of the same "Alligator" book co-written by several authors. *Id.* The episode also showed footage of speaker Jeff Hoyle describing how agents could pay to record a pre-scripted radio show "interviewing" the agent so the agent could later distribute the recording to impress customers. *Id.* at 10.

The segment included commentary from Attorney General Swanson, who stated Mr. Clark did "not tell[] the truth when he tells those agents that an annuity is the most liquid place a senior citizen can put their money," and that he provided attendees with "loaded guns so they can walk into [a] senior's home and rip them off." *Id.* at 9-10.

The episode next showed hidden camera footage of a salesman who graduated from Annuity University, juxtaposing the earlier seminar excerpts of Mr. Clark with the salesman's pitch. *Id.* at 10-11. Mr. Hansen and Attorney General Swanson criticized the Annuity University-educated salesman for glossing over surrender penalties. *Id.* at 12. The episode also showed hidden camera footage of another salesman who had "more than a dozen law suits [sic] pending" against him, but it did not link him to Annuity University. *Id.* at 14.

Toward the end, the episode showed BCA's lawyer declining an on-camera interview. *Id.* at 18. It then summarized a series of letters from Mr. Clark's lawyers. *Id.* The letters criticized *Dateline* for going undercover, argued the episode's quotes were "not 'in full context,'" stated Mr. Clark taught agents to be "honest, ethical, and

service-oriented," and said "it's the 'duty' of an insurance agent to 'present the facts, both pleasant and unpleasant, to customers.'" *Id*.

Finally, the episode noted a settlement—unrelated to BCA—between Attorney General Swanson's office and a large insurance company named Allianz, and said "other lawsuits [were] pending against Allianz and other insurance companies nationwide." *Id*.

The segments featuring or referencing BCA totaled about nine and a half minutes, *Dateline* episode at 28:44-40:35; 57:58-58:52, and quoted fewer than 120 words from the seminar.

## B. *Procedural Background*

### 1. **District Court's Dismissal of Original Complaint and Stay of Discovery**

In March 2009, BCA and Mr. Clark (collectively, "BCA") filed suit in the United States District Court for the District of Colorado for defamation, trespass, fraud, invasion of privacy, and civil rights violations under 42 U.S.C. § 1983. *See* Dist. Ct. Doc. 1. The complaint invoked the district court's diversity jurisdiction under 28 U.S.C. § 1332 for its state law claims and relied on 28 U.S.C. § 1331 and § 1343 as the jurisdictional basis for its civil rights claim. Defendants NBC, General Electric, reporter Hansen, and producers Eckert and Amorebieta (collectively, "NBC") moved to dismiss BCA's complaint.

In October 2009, the district court dismissed BCA's complaint without prejudice. The court dismissed the defamation claim because BCA's complaint alleged in only conclusory terms that specific episode excerpts were falsely taken out

of context and because the complaint did not provide enough factual support to explain "how the broadcast statements were taken out of context to such an extent as to be rendered false." Dist. Ct. Doc. 38 at 5. The court also dismissed BCA's claims for trespass, fraud, and invasion of privacy.[6] Finally, the court dismissed BCA's 42 U.S.C. § 1983 civil rights claim because it was based on conclusory allegations and was tied to the other, already-dismissed causes of action.

The court also granted NBC's motion to stay discovery based on Colorado's qualified newsperson's privilege statute, Colo. Rev. Stat. § 13-90-119. The stay order covered the surreptitious recording that *Dateline*'s producers made at Annuity University.

## 2. *Brokers' Choice I:* **District Court's Dismissal of First Amended Complaint**

### a. *BCA's amended complaint*

In November 2009, BCA filed an amended complaint, re-pleading only the defamation and § 1983 claims.[7] Dist. Ct. Doc. 39; *see also* App. Vol. 1 at 19-66.

---

[6] The district court dismissed BCA's trespass claim because the NBC producers were present only on the part of the property open to attendees, did not disturb the seminar, did not invade a private place, and did not steal any of BCA's property. Dist. Ct. Doc. 38 at 20. It dismissed BCA's fraud claim because it was conclusory and insufficiently pled. *Id.* at 21. It dismissed BCA's invasion of privacy claim because the NBC producers attended a business seminar, where nothing "remotely personal was discussed." *Id.* at 22. Thus, NBC did not invade the solitude or private affairs of BCA or Mr. Clark. *Id.*

[7] BCA's § 1983 claims alleged that Mr. Eckert and Ms. Amorebieta acted as agents of the State of Alabama and deprived BCA of its Fourth and Fourteenth Amendment rights. The district court dismissed the § 1983 claims in *Brokers'*

Continued . . .

BCA alleged the *Dateline* episode reported Mr. Clark's statements out of context to create a false impression that he advocated tactics to take advantage of seniors. Am. Compl. at 4-5, ¶¶ 13-14. It averred that NBC recklessly and maliciously extracted 112 words from the two-day seminar and then "fram[ed] and juxtapose[ed]" those words with false and misleading statements from Mr. Hansen to produce a program that contained "outright lies, false implications, and misleading half-truths," about BCA. *Id.* at 43, ¶¶ 126-28.

Without access to NBC's surreptitious recording of the October 2007 Annuity University seminar, BCA's amended complaint used statements from another seminar taught by Mr. Clark in March 2007. BCA alleged all of Mr. Clark's lectures "adhere closely" to the same content and that the March 2007 lecture would provide "in substance the true context of the snippets selected by *Dateline* and placed in the false context *Dateline* created." *Id.* at 22, ¶ 65. BCA's amended complaint also reserved "Exhibit A" for NBC's seminar recording and stated BCA would "request the Court to order its disclosure and placement in the record." *Id.* at 5, ¶ 14.[8] BCA alleged the

---

*Choice I*, and we affirmed. *See Brokers' Choice II*, 757 F.3d at 1149. These claims are not at issue in the instant appeal.

[8] The amended complaint stated: "The true context of the words broadcast by Defendants was captured on the hidden video footage currently in Defendants' possession. Disclosure of the recording is a prerequisite to conclusively determining the true context of Clark's words; accordingly, Plaintiffs reserve Exhibit A to this Amended Complaint for that footage and will request the Court to order its disclosure and placement in the record. In the absence of disclosure of the two days of hidden video footage, Plaintiffs must rely on other Annuity University lectures presented by Clark to establish the true context of his words." Am. Compl. at 5, ¶ 14.

"falsity of the context" reported in the *Dateline* episode would be clear when the episode was compared with the recording from the October 2007 Annuities University seminar. *Id.* at 43, ¶ 127.

BCA also re-alleged its § 1983 civil rights claim. *Id.* at 44-46, ¶¶ 130-36. As the district court summarized in *Brokers' Choice I*, the main differences between the original and amended complaints were that the latter added statements from the March 2007 seminar and dropped the claims for trespass, fraud, and intrusion. 2011 WL 97236, at *2.

b. *BCA's motion for production of the seminar recording*

Along with its amended complaint, BCA moved for production of the October 2007 Annuity University seminar recording. As before, the district court denied this motion based on the Colorado newsperson's privilege statute, Colo. Rev. Stat. § 13-90-119.

c. *NBC's motion to dismiss*

NBC moved to dismiss BCA's amended complaint. In January 2011, the district court granted that motion and dismissed BCA's case—this time with prejudice.

The district court analyzed 11 statements from the *Dateline* episode and a preview of the episode that BCA's amended complaint alleged to be false and defamatory. *Brokers' Choice I*, 2011 WL 97236, at *4-9. The court compared each statement to the factual assertions in the amended complaint. It concluded each statement in the *Dateline* episode was substantially true because NBC had accurately

reported Mr. Clark's statements. The court dismissed BCA's amended complaint, including its § 1983 civil rights claim, with prejudice, and BCA appealed.

3. *Brokers' Choice II*:  **Tenth Circuit's Partial Reversal**

On appeal, a different panel of this court affirmed dismissal of the § 1983 civil rights claim, but reversed dismissal of the defamation claim. As to the latter, the panel described the gist of the episode and ruled the district court had erred in its analysis. It also determined the seminar recording was not privileged.

The panel first summarized the "gist" of the *Dateline* episode:  "Clark teaches insurance agents to scare and mislead seniors into buying unsuitable insurance products." *Brokers' Choice II*, 757 F.3d at 1138.

The panel then held the district court's statement-by-statement analysis was insufficient. It said that "Clark cannot, and does not, deny the accuracy of the words attributed to him in the *Dateline* segment." *Id.* But because BCA claimed NBC presented the statements out of context and thereby gave a false impression, the panel held the district court should have used a more "global approach" to analyze those statements. *Id.* It said "[t]he totality of circumstances must be considered," meaning the full *Dateline* episode must be compared to the entirety of Mr. Clark's Annuity University seminar. *Id.* It explained that, at trial, "[i]f that comparison were to clearly and convincingly show the aired statements to have left viewers with a false

- 11 -

impression of the gist of Clark's seminars (were not substantially true) he has been defamed by *Dateline*, otherwise he has not." *Id.*[9]

The panel determined BCA's amended complaint had alleged sufficient facts to state a claim for defamation—at least on the element of falsity—because the amended complaint alleged the seminar recording would show "a context substantially different than the 'gist' of *Dateline*'s program." *Id.* at 1139. BCA had plausibly alleged that *Dateline* "selected bits and pieces" from the full seminar to project a false impression of Mr. Clark's presentation. *Id.* at 1139-40.[10]

The panel also reversed the district court's privilege determination that had denied BCA access to the seminar recording. *Id.* at 1140. It held the newsperson's privilege statute did not protect the recording from discovery because it was directly relevant to the defamation claim, there were no alternative means to obtain the information, and the balance of interests weighed in favor of BCA. *Id.* at 1141.

---

[9] Two points of clarification: First, the issue the previous panel reviewed was whether the *Dateline* episode was substantially true as to BCA, not whether it conveyed a defamatory meaning. Second, the panel explained that substantial truth was generally a factual question for the jury, but "[w]hen 'underlying facts as to the gist or sting are undisputed, [it] may be determined as a matter of law.'" *Brokers' Choice II*, 757 F.3d at 1137 (quoting *Lundell Mfg. Co. v. Am. Broad. Cos.,* 98 F.3d 351, 360 (8th Cir. 1996)).

[10] BCA alleged that "the unedited footage would show Clark teaching the downside of annuities, urging his students to probe into the customer's personal situation to determine the most suitable product, repeatedly telling students annuities are not for everyone, stressing BCA's code of ethics which require full disclosure of various advantages and disadvantages of annuity products, and promoting personal involvement in the community to gain credibility." *Id.* at 1139.

4. *Brokers' Choice III:* **District Court's Dismissal of the Amended Complaint Based on Comparison of the Episode with the Seminar Recording**

After remand to the district court, NBC filed its second motion to dismiss the amended complaint, or, in the alternative, for summary judgment. With its motion, NBC provided the seminar recording and a transcript thereof. The recording became Exhibit A to the amended complaint.

The district court, following this court's direction, said it would use the seminar recording to determine whether the *Dateline* episode was substantially true. *Brokers' Choice III*, 138 F. Supp. 3d at 1196. In other words, to decide whether the amended complaint plausibly alleged material falsity, the district court evaluated whether the gist of the *Dateline* episode gave a false or substantially true impression of the seminar.

In response to BCA's contention that NBC's second motion to dismiss should not be heard, the district court said it was proper to rule on the motion because the seminar recording constituted new evidence that was not available when it decided *Brokers' Choice I*. As a result, neither the law of the case doctrine nor Federal Rule of Civil Procedure 12(g)(2) barred the motion. *Brokers' Choice III*, 138 F. Supp. 3d at 1195 n. 3, 1196. Because (1) the seminar recording was "central to [BCA's] defamation claim," (2) the transcripts of the recording were "undisputed," (3) BCA had reserved a place in its amended complaint—Exhibit A—for the seminar recording, and (4) the recording was "independently sufficient, in and of [itself], to

- 13 -

test the sufficiency of the [amended] [c]omplaint," the court decided the motion as one to dismiss rather than one for summary judgment. *Id.* at 1196-97.[11]

The district court then analyzed BCA's defamation claim, liberally citing and bolding representative excerpts from the seminar recording, the *Dateline* episode, BCA's amended complaint, and *Brokers' Choice II*. It began by describing the "overall context" of the Annuity University seminar: each attendee had paid BCA to learn how to sell annuities, and Mr. Clark repeatedly emphasized that his advice would help the attendees, who were "[t]here essentially to make money," to achieve this goal. *Id.* at 1200.

After comparing the seminar recording to the *Dateline* episode and the allegations in the amended complaint, the court concluded the seminar recording did not support the "rosy picture of the seminar painted by [BCA's] Amended Complaint." *Id.* at 1199. It concluded the episode was substantially true. BCA could not show that "viewing the broadcast (as opposed to seeing the entire seminar) would have a different effect on the mind of the [viewer] from that which the pleaded truth would have produced." *Id.* (quotations omitted). This conclusion resulted from the court's analysis of what it regarded as the three elements of the *Dateline*

---

[11] *See also Brokers' Choice III*, 138 F. Supp. 3d at 1197 (stating that since the court could "consider[] the transcripts and compare[] them to the *Dateline* broadcast[, it found that] as a matter of law, no more evidence [was] needed to test the sufficiency of the defamation claim, and conversion to summary judgment [was] not required.").

episode's gist:  (1) Mr. Clark's scare tactics, (2) the suitability of annuities, and (3) misleading credentials.[12]  *Id.* at 1202, 1205, 1213.

a.  *Scare tactics*

The district court quoted the seminar recording to demonstrate Mr. Clark had advocated using "scare tactics."  *Id.* at 1203.  It referred to his telling attendees to discover seniors' emotional problems and then "solve" those problems by selling them an annuity.  *Id.*  The court quoted Mr. Clark's seminar statements, including:

- "Where's the client's problem?  Okay.  And if that's not an emotionally based problem, you have no sale."

- "You uncover and you discover problems.  That's what we do.  And then we solve those problems."

- "I bring these things out that disturb the hell out of them . . . I bring out the stuff when they can't sleep at night."

*Id.* at 1203 (citing Recording Tr. Day 1 at 76[13]).

The district court also listed examples of emotional appeals Mr. Clark suggested to influence potential clients, including the financial security of a client's

---

[12] The *Brokers' Choice II* panel stated the gist of the *Dateline* episode was that "Clark teaches insurance agents to scare and mislead seniors into buying unsuitable insurance products."  757 F.3d at 1138.  The district court interpreted "mislead seniors" to include only the episode's discussion of misleading credentials. *Brokers' Choice III*, 138 F. Supp. 3d at 1213.  As we explain below, we find this view to be overly narrow.

[13] The recording transcripts ("Recording Tr.") cited in this opinion are transcripts of the surreptitious seminar recording.  We cite to the transcripts submitted by BCA as Exhibits 1B and 1C to its response to NBC's motion to dismiss.  Dist. Ct. Doc. 130-3, 130-4.  These transcripts were prepared from the seminar recording attached to BCA's amended complaint as Exhibit A.

children; the prospect of a disfavored son-in-law taking half of the inheritance from a client; and a client being the cause of family conflict, divorce, and bankruptcy. *Id.* at 1204-05 (citing Recording Tr. Day 1 at 33, 103-05).

The district court concluded the amended complaint's allegation that the seminar would show Mr. Clark had not spoken of misleading senior citizens with scare tactics rang "hollow," and that "*Dateline*'s portrayal of [the] seminar as advocating the use of 'scare tactics' . . . was, in fact, substantially true." *Id.* at 1205.

b. *Suitability of annuities*

The district court also found the *Dateline* episode's gist that the seminar taught agents to sell unsuitable annuities to seniors to be substantially true. Based on the seminar recording, it noted Mr. Clark "already assumed" annuities were the "most suitable" product for the potential client and only discussed criticisms of annuities so attendees could learn how to deflect them and close a sale. *Id.* at 1207-13. It found Mr. Clark's "discussion" of annuity risks was only "superficial" and assumed that these risks were not a problem. *Id.* at 1210. The court said that although Mr. Clark acknowledged at the seminar that annuities might not be suitable for everyone, he also stated those concerns "d[id] not apply to seniors" and "taught . . . attendees problematic tactics to target seniors specifically." *Id.* at 1211.

Finally, the court acknowledged Mr. Clark suggested that agents associate with local ethics and business organizations, but observed he did so only to teach agents "to use these organizations' names for marketing purposes." *Id.* at 1212. The court concluded the seminar did not "specifically rebut" *Dateline*'s report that agents were

taught to "mislead seniors in selling sometimes-unsuitable products," and that this portion of the gist was substantially true. *Id.* at 1213.

c. *Misleading credentials*

Finally, the district court addressed whether the seminar taught agents to mislead seniors. The court noted the *Dateline* episode's assertion that Annuity University was "part of an underground industry that helps insurance agents puff up their credentials and mislead [consumers] about who they really are." *Id.* at 1213. Analyzing the seminar recording, it explained that speaker Jeff Hoyle encouraged attendees to purchase "ghost-written" articles or interview spots on a "pre-scripted radio show" that could "work to [the attendee's] benefit" in building credibility with clients. *Id.* at 1214-15. The court concluded the episode's gist regarding misleading credentials was substantially true in light of the seminar recording.

\* \* \* \*

Based on its comparison of the *Dateline* episode with the seminar recording and BCA's amended complaint, the district court concluded *Dateline*'s overall portrayal of the seminar was "substantially true" and dismissed the case with prejudice.[14]

## II. **BCA'S PROCEDURAL OBJECTIONS**

We first consider BCA's procedural challenges to the district court's consideration of NBC's latest motion to dismiss. Because this is a diversity case, we

---

[14] The court noted it dismissed without granting leave to amend because further amendment would be futile.

apply federal law to procedural questions and apply the substantive law of the forum

state, Colorado, to analyze the underlying claims. *See Gasperini v. Ctr. for*

*Humanities, Inc.*, 518 U.S. 415, 427 (1996); *Hill v. J.B. Hunt Transp., Inc.*, 815 F.3d

651, 667 (10th Cir. 2016).

BCA presents three procedural challenges on appeal: (1) the panel decision in

*Brokers' Choice II* barred the district court's consideration of NBC's motion to

dismiss under the law of the case doctrine; (2) Federal Rule of Civil Procedure

12(g)(2) barred the motion; and (3) the motion, if considered at all, should have been

analyzed as a motion for summary judgment. We reject each of these arguments.

### A. *Law of the Case*

BCA argues, based on the law of the case doctrine, that the district court

should not have considered NBC's motion to dismiss. This argument lacks merit.

### 1. **Legal Background**

The law of the case doctrine generally provides that "when a court decides upon a

rule of law, that decision should continue to govern the same issues in subsequent stages

in the same case." *United States v. Monsisvais*, 946 F.2d 114, 115 (10th Cir. 1991)

(quotations omitted) (quoting *Arizona v. California*, 460 U.S. 605, 618 (1983)). An

appellate court decision on a particular issue, unless vacated or set aside, governs the

issue during all later stages of the litigation in the district court and thereafter on any

further appeal. *Id.* at 115-16. In practice,

> [W]hen a case is appealed and remanded, the decision of the appellate court
> establishes the law of the case and it *must* be followed by the trial court on
> remand. If there is an appeal from the judgment entered after remand, the

decision on the first appeal establishes the law of the case to be followed on the second.

*Id.* at 116 (quoting 1B Moore's Federal Practice ¶ 0.404[1] at 119 (2d ed. 1991) (footnote omitted)).[15]

The doctrine does not apply when: (1) substantially different, new evidence has been introduced; (2) later, contradictory controlling authority exists; or (3) the original order is clearly erroneous. *Bishop v. Smith*, 760 F.3d 1070, 1086 (10th Cir. 2014); *Monsisvais*, 946 F.2d at 117 (citing *Major v. Benton*, 647 F.2d 110, 112 (10th Cir. 1981)). The first exception is inapplicable when the producing party had the evidence "in its possession, but failed to produce [it]" during the first proceeding. *Monsisvais*, 946 F.2d at 117.[16]

We review de novo whether the law of the case doctrine applies. *Vehicle Mkt. Research, Inc. v. Mitchell Int'l, Inc.,* 839 F.3d 1251, 1256 (10th Cir. 2016).

---

[15] The doctrine does not apply to dicta—statements in an opinion that are unnecessary for its disposition. *Bishop v. Smith*, 760 F.3d 1070, 1083 (10th Cir. 2014).

[16] For example, we denied application of the "different or new evidence" exception when the producing party chose not to produce at the first proceeding: "'[t]here is nothing in the record to indicate that the evidence produced at the hearing after remand was unavailable to the taxpayers during the first trial. The taxpayers simply chose not to produce that evidence. They chose their trial strategy, litigated accordingly, and lost. They are not now entitled to resurrect a previously abandoned issue.'" *United States v. Monsisvais*, 946 F.2d 114, 117 (10th Cir. 1991) (quoting *Baumer v. United States*, 685 F.2d 1318, 1321 (10th Cir. 1982)).

2. **Analysis**

BCA first argues that, under the law of the case doctrine, the district court should not have addressed NBC's motion to dismiss. BCA relies on *Brokers' Choice II*'s quote that the "issue of substantial truth is an issue of fact best resolved by summary judgment after discovery or before a jury." *Brokers' Choice II*, 757 F.3d at 1137 n.8. But BCA overlooks critical language from *Brokers' Choice II*: "When 'underlying facts as to the gist or sting are undisputed, substantial truth may be determined as a matter of law.'" *Id.* at 1137 (quoting *Lundell Mfg. Co. v. Am. Broad. Cos.*, 98 F.3d 351, 360 (8th Cir. 1996)). We have previously said that "if, as a matter of law, the complaint . . . is insufficient, a motion to dismiss is proper." *Torres v. First State Bank of Sierra Cty.*, 550 F.2d 1255, 1257 (10th Cir. 1977); *see* Fed. R. Civ. P. 12(b)(6); *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009) ("The legal sufficiency of a complaint is a question of law. . . .").[17]

---

[17] *See also Ramsey v. Fox News Network, LLC,* 351 F. Supp. 2d 1145, 1154 (D. Colo. 2005) (applying Colorado law and resolving defamation action on a motion to dismiss); *Stump v. Gates*, 777 F. Supp. 808, 825-26 (D. Colo. 1991) (same), *aff'd*, 986 F.2d 1429 (10th Cir. 1993); *Henderson v. Times Mirror Co.*, 669 F. Supp. 356, 362 (D. Colo. 1987) (same).

Although federal law governs the procedural questions in this case, the Colorado Court of Appeals also recently recognized that the substantive issue of truth or falsity may be resolved in a defamation action on a motion to dismiss. *Fry v. Lee*, No. 12CA1575, 2013 WL 3441546, at *5 (Colo. App. June 20, 2013) ("[P]rompt resolution of defamation actions, by summary judgment or motion to dismiss, is appropriate. Such a motion to dismiss for failure to state a claim can be granted on the basis that the challenged publication was substantially true." (citations omitted)), *cert. denied sub nom.*, *Fry v. Denver Post LLC*, No. 13SC676, 2014 WL 1356853 (Colo. Apr. 7, 2014).

BCA also argues that *Brokers' Choice II*'s determination that BCA's amended complaint stated a plausible defamation claim forms the law of the case and precludes NBC from again challenging the legal sufficiency of BCA's same factual allegations. But this argument is again misguided.[18]

First, the law of the case only "continue[s] to govern the *same issues* in subsequent stages in the same case." *Monsisvais*, 946 F.2d at 115 (emphasis added). But here, the district court did not consider the same issue on remand as before. BCA effectively amended its operative complaint when it received the once-privileged seminar recording from NBC and inserted that recording as Exhibit A. The insertion had a legally significant effect on the amended complaint: if there is any dispute between the allegations in the complaint and the content of the attached exhibit, the exhibit controls. *See Olpin v. Ideal Nat'l Ins. Co.*, 419 F.2d 1250, 1255 (10th Cir. 1969). The issue before the district court—evaluating the legal sufficiency of BCA's amended complaint—changed when the underlying complaint changed.

Second, the addition of the seminar recording to BCA's amended complaint qualifies as new evidence, precluding application of the law of the case doctrine. On NBC's earlier motions to dismiss, neither the district court nor the parties considered

---

[18] BCA again overlooks critical language from *Brokers' Choice II*. The panel instructed that the district court should have conducted a "more global approach" in evaluating BCA's amended complaint. 757 F.3d at 1138. The panel stated that "[at trial] the aired segment would necessarily be compared to the entirety of Clark's seminar presentation," and it remanded for "further proceedings consistent with this judgment." *Id.* at 1149. The *Brokers' Choice II* panel contemplated that further proceedings would necessarily require the district court to compare the episode and the recording.

the recording because the district court had stayed discovery of it based on the Colorado newsperson's privilege statute. When this court reversed that ruling and NBC was required to produce the recording, *Brokers' Choice II*, 757 F.3d at 1143, BCA added it to its complaint as new evidence. Although "previously-available evidence often cannot be used to unsettle law of the case," *Bishop*, 760 F.3d at 1087, the seminar recording was not previously available because it was, by order of the district court, privileged material. It became available only when this court held that the privilege should not apply. *Brokers' Choice II*, 757 F.3d at 1143. Although NBC had possession of the recording and could have waived the privilege and used the recording in support of its first motion to dismiss, Colo. Rev. Stat. § 13-90-119(4) (explaining that the privilege may be waived by disclosure), BCA has produced no authority to suggest this possibility should preclude the new-evidence-law-of-the-case exception. To do so would penalize the exercise of a privilege established by the Colorado legislature.

We have said that law of the case "is not an inexorable command, but is to be applied with good sense." *Monsisvais*, 946 F.2d at 117. The district court exercised good sense in considering NBC's motion to dismiss after NBC produced the seminar recording to BCA.

### B. *Federal Rule of Civil Procedure 12(g)(2)*

BCA argues the district court erred in considering NBC's motion to dismiss because Rule 12(g)(2) prevents a party from raising a defense or objection that was available to the party but omitted in its earlier motion to dismiss. Because the

- 22 -

seminar recording was available but omitted from NBC's earlier motions to dismiss, BCA contends NBC's assertion of substantial truth based on that recording is waived. We disagree.

1. **Legal Background**

Rule 12(g)(2) states: "Except as provided in Rule 12(h)(2) . . . a party that makes a motion under [Rule 12] must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion." Rule 12(h)(2) provides an exception: a motion for "[f]ailure to state a claim upon which relief can be granted . . . may be raised: . . . by a motion under Rule 12(c)." Under Rule 12(c), a party may move for judgment on the pleadings after the pleadings are closed, but early enough not to delay trial.

In other words, "although Rule 12(g)(2) precludes successive motions under Rule 12, it is expressly subject to Rule 12(h)(2), which allows parties to raise certain defenses, including the failure to state a claim upon which relief may be granted . . . by a motion for judgment on the pleadings under Rule 12(c)." *Albers v. Bd. of Cty. Comm'rs of Jefferson Cty., Colo.*, 771 F.3d 697, 701 (10th Cir. 2014); *see also* 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1385 (3d ed., Apr. 2017 update) ("However, even though a Rule 12(b) motion has been made and a second Rule 12(b) motion is not permitted, the three defenses listed in

Rule 12(h)(2) may be raised on a motion under Rule 12(c) for judgment on the pleadings. . . .").[19]

Further, because we use the same de novo standard of review "when evaluating 12(b)(6) and 12(c) motions . . . our decision [on the successive 12(b)(6) motion] would be the same whether considered as a 12(b)(6) motion or a 12(c) motion." *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 n.2 (10th Cir. 2002).

## 2. **Analysis**

The district court correctly considered NBC's motion for two reasons.

First, BCA effectively amended its complaint by adding the seminar recording as Exhibit A. NBC's instant motion to dismiss was thus a permissible response to that amended complaint. *See, e.g.*, *Kaplan v. Reed,* 28 F. Supp. 2d 1191, 1199 (D. Colo. 1998) (considering a third round of motions to dismiss by defendants in response to plaintiffs' second amended complaint); *Pioneer Craft House, Inc. v. City of S. Salt Lake*, No. 2:13-cv-705, 2016 WL 843274, at *1 (D. Utah Mar. 1, 2016) (unpublished) (considering and granting defendant's second motion to dismiss in response to plaintiff's amended complaint).

Second, the court's consideration of NBC's motion was proper under Rule 12(g)(2) and Rule 12(h)(2) because the court could have considered the motion as a motion for judgment on the pleadings under Rule 12(c). *Albers*, 771 F.3d at 701;

---

[19] Rule 12(h)(2) lists the following three defenses: failure to (1) "*state a claim upon which relief can be granted*"; (2) "to join a person required by Rule 19(b)"; and (3) "to state a legal defense to a claim" (emphasis added).

*Lipari v. U.S. Bancorp NA*, 345 F. App'x. 315, 317 (10th Cir. 2009) (unpublished)[20] ("Rule 12(g)(2) specifically provides that a party may file a motion for failure to state a claim under Rule 12(c), and the district court permissibly treated [the defendant's] second Rule 12(b)(6) motion as though it had been styled under Rule 12(c).").[21]

### C. *Consideration as a Motion to Dismiss*

BCA argues the district court erroneously considered NBC's motion as a motion to dismiss because the court "employed analytical tools" available only to consider a Rule 56 summary judgment motion. It argues the court erred by weighing evidence, resolving disputed issues of material fact, and failing to view disputed facts in the light most favorable to BCA. We reject BCA's arguments.

### 1. **Legal Background**

A motion to dismiss challenging the legal sufficiency of the complaint is properly considered under Rule 12(b)(6) if the court analyzes only the complaint

---

[20] Although not precedential, we find the reasoning of the unpublished cases cited in this opinion instructive. *See* 10th Cir. R. 32.1 ("Unpublished decisions are not precedential, but may be cited for their persuasive value."); *see also* Fed. R. App. P. 32.1.

[21] We reject BCA's argument that NBC waived its "substantial truth" defense based on the seminar recording by raising it and submitting the recording for the first time in this motion. This argument is factually inaccurate because NBC asserted its "substantial truth" defense in each of its prior motions to dismiss. *See* App. at 87 (Motion to Dismiss the Amended Complaint); Dist. Ct. Doc. 10 (original Motion to Dismiss). We also reject the argument because the motion was properly considered under Rules 12(g)(2) and 12(h)(2). *See Albers*, 771 F.3d at 701 (rejecting waiver argument and allowing consideration of new theory supporting defense of failure to state a claim where second Rule 12(b)(6) motion to dismiss could be considered under Rules 12(g)(2) and 12(h)(2)).

itself.  *See Miller v. Glanz*, 948 F.2d 1562, 1565 (10th Cir. 1991) ("The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted.").  When a party presents matters outside of the pleadings for consideration, as a general rule "the court must either exclude the material or treat the motion as one for summary judgment." *Alexander v. Oklahoma*, 382 F.3d 1206, 1214 (10th Cir. 2004) (quoting *Nichols v. United States*, 796 F.2d 361, 364 (10th Cir. 1986)).  A district court may, however, consider documents attached to or referenced in the complaint if they "are central to the plaintiff's claim and the parties do not dispute the documents' authenticity." *Jacobsen*, 287 F.3d at 941 (citing *GFF Corp. v. Assoc'd Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997)).[22]

> [C]onversion to summary judgment when a district court considers outside materials is to afford the plaintiff an opportunity to respond in kind. When a complaint refers to a document and the document is central to the plaintiff's claim, the plaintiff is obviously on notice of the document's contents, and this rationale for conversion to summary judgment dissipates.

*GFF Corp.*, 130 F.3d at 1384.

---

[22] *See also Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009) ("In evaluating a Rule 12(b)(6) motion to dismiss, courts may consider not only the complaint itself, but also attached exhibits and documents incorporated into the complaint by reference." (citations omitted)); *Pace v. Swerdlow*, 519 F.3d 1067, 1072-73 (10th Cir. 2008) (citing *Utah Gospel Mission v. Salt Lake City Corp.*, 425 F.3d 1249, 1253-54 (10th Cir. 2005) ("We have recognized however, that a document central to the plaintiff's claim and referred to in the complaint may be considered in resolving a motion to dismiss, at least where the document's authenticity is not in dispute.")).

We review for abuse of discretion a district court's refusal to convert a Rule 12(b)(6) motion to dismiss into a Rule 56 motion for summary judgment. *Lowe v. Town of Fairland, Okla.*, 143 F.3d 1378, 1381 (10th Cir. 1998). When presented with a Rule 12(b)(6) motion, the district court has broad discretion in determining whether to accept materials beyond the pleadings. *Id.* (citing 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1366 (1990)).

2. **Analysis**

BCA's arguments miss the mark.

First, the district court properly considered NBC's motion as one to dismiss the amended complaint. As the *Brokers' Choice II* panel stated, when "underlying facts as to the gist or sting are undisputed, substantial truth may be determined as a matter of law." 757 F.3d at 1137 (quoting *Lundell Mfg. Co.*, 98 F.3d at 360). Thus, material falsity may be analyzed under a Rule 12(b)(6) motion to dismiss or a Rule 56 motion for summary judgment. Whether a Rule 12(b)(6) motion to dismiss should have been converted into a Rule 56 motion for summary judgment turns on the materials considered by the district court. *See Alexander*, 382 F.3d at 1214. On remand, the district court considered only the pleadings, the seminar recording, and the *Dateline* episode. *See generally Brokers' Choice III*, 138 F. Supp. 3d 1191. The seminar recording and the episode were (1) attached to or referenced in the amended complaint, (2) central to BCA's claim, and (3) undisputed as to their accuracy and authenticity. *See id.* at 1196-97. The only materials needed to evaluate material falsity in this case could therefore be considered in ruling on a 12(b)(6) motion.

*Jacobsen*, 287 F.3d at 941. The district court did not abuse its discretion and properly considered NBC's motion as a Rule 12(b)(6) motion to dismiss. *See Fry v. Lee*, No. 12CA1575, 2013 WL 3441546, at *5 (Colo. App. June 20, 2013) ("[A] motion to dismiss for failure to state a claim can be granted on the basis that the challenged publication was substantially true."), *cert. denied sub nom.*, *Fry v. Denver Post LLC*, No. 13SC676, 2014 WL 1356853 (Colo. Apr. 7, 2014).

Second, we need not address BCA's alleged errors regarding the district court's analytical tools because our review is de novo. *TMJ Implants, Inc. v. Aetna, Inc.*, 498 F.3d 1175, 1181 (10th Cir. 2007) ("[B]ecause our review is de novo, we need not concern ourselves with" contentions that the district court resolved issues of fact against the non-movant and ignored issues of disputed material fact).

## III. **MERITS OF THE DISTRICT COURT'S DISMISSAL**

We next address BCA's contention that the district court erred in dismissing the amended complaint because it wrongly concluded the *Dateline* episode was substantially true. As previously stated, because this is a diversity case, we apply federal law to procedural questions and apply the substantive law of the forum state, Colorado, to analyze the underlying claims. *See Gasperini*, 518 U.S. at 427; *Hill*, 815 F.3d at 667. Although defamation is historically a state common law claim, the Supreme Court has significantly limited and shaped its application based on First Amendment considerations. *See TMJ Implants*, 498 F.3d at 1181.

BCA argues the district court failed to view the seminar in the light most favorable to it and to draw all reasonable inferences in its favor. BCA asserts the

Annuity University seminar did not teach attendees to scare and mislead seniors into buying unsuitable insurance products and that *Dateline*'s presentation to that effect was materially false. We disagree. Having compared the *Dateline* episode and the seminar recording, we conclude the gist of the episode and the statements in the episode that BCA challenges in its amended complaint were not materially false and affirm the district court's dismissal.

A. *Standard of Review and Analytical Considerations*

1. **Standard of Review and Sufficiency of a Complaint**

We review de novo a district court's Rule 12(b)(6) dismissal of a complaint for failure to state a claim. *Jacobsen*, 287 F.3d at 941. To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must plead sufficient factual allegations "to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In other words, dismissal under Rule 12(b)(6) is appropriate if the complaint alone is legally insufficient to state a claim. *Peterson v. Grisham*, 594 F.3d 723, 727 (10th Cir. 2010).

In ruling on a motion to dismiss for failure to state a claim, "[a]ll well-pleaded *facts*, as distinguished from conclusory allegations, must be taken as true," and the court must liberally construe the pleadings and make all reasonable inferences in favor of the non-moving party. *Ruiz v. McDonnell*, 299 F.3d 1173, 1181 (10th Cir.

2002) (emphasis added) (quotations omitted).  As applied here, a defamation complaint cannot couch allegations of falsity in vague, conclusory terms.  *Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 188 (2d Cir. 2000); *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092 (4th Cir. 1993).

### 2.  **Effect of an Exhibit to a Complaint**

When a complaint includes an attached exhibit "[the exhibit's] legal effect is to be determined by its terms rather than by the allegations of the pleader." *Droppleman v. Horsley*, 372 F.2d 249, 250 (10th Cir. 1967) (quotations omitted); *see also Jacobsen*, 287 F.3d at 941 ("[I]n deciding a 12(b)(6) motion, the legal effect of the [attached documents] are determined by the [documents] themselves rather than by allegations in the complaint." (citing *Droppleman*)).  This means that, although we accept all well-pleaded allegations as true and draw all reasonable inferences in favor of the plaintiff, if there is a conflict between the allegations in the complaint and the content of the attached exhibit, the exhibit controls.  *See Jackson v. Alexander,* 465 F.2d 1389, 1390 (10th Cir. 1972) ("[W]e need not accept as true . . . allegations of fact that are at variance with the express terms of an instrument attached to the complaint as an exhibit and made a part thereof"); *Olpin*, 419 F.2d at 1255; 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1327 (3d ed., Apr. 2017 update) ("[W]hen a disparity exists between the written instrument annexed to the pleadings and the allegations in the pleadings, the terms of the written instrument will control, particularly when it is the instrument being relied upon by the party who made it an exhibit.").

B. *Legal Background*

The district court dismissed BCA's defamation claim because it failed to allege the episode was materially false or was not substantially true.  Our review of that ruling calls for discussion of how the truth-or-falsity issue fits in the broader context of contemporary defamation law.

## 1.  Development of Defamation Law

Until the Supreme Court decided *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), a common law claim for defamation in most states was a strict liability tort that required proof only of publication of an unprivileged defamatory statement about the plaintiff.  Falsity and damages were presumed, truth was a defense, and proof of fault was not required.  *See id.* at 262-63, 267 (describing Alabama law); Restatement (Second) of Torts § 581A, cmt. b (1977); Restatement (Second) of Torts § 620, cmt. c (1977); 1 Robert D. Sack, *Sack on Defamation: Libel, Slander, and Related Problems* § 2:1.1 (4th ed. 2016).[23]

In *New York Times*, the Supreme Court limited defamation liability by developing "standards that satisfy the First Amendment."  376 U.S. at 269.  The Court declared that a "public official" seeking "damages for a defamatory falsehood" about his "official conduct" must prove with "convincing clarity" that the statement

---

[23] In *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 348 (1974), the Supreme Court stated the need to shield "the press and broadcast media from the rigors of strict liability for defamation."  *See also Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 11-17 (1990) (recounting the development of defamation law away from strict liability).

was made with "actual malice"—that is, "with knowledge that [the statement] was false or with reckless disregard of whether it was false or not." *Id.* at 279-80, 285.

The "actual malice" standard—by requiring proof that the defendant published with knowledge or reckless disregard that the statement was false—also requires proof that the statement was false. *See Garrison v. Louisiana*, 379 U.S. 64, 74 (1964) (explaining *New York Times* requires a public official to prove "the utterance was false"); *see also Air Wisc. Airlines Corp. v. Hoeper*, 134 S. Ct. 852, 861 (2014) ("[W]e have long held that actual malice requires material falsity.").

In *Gertz v. Robert Welch, Inc.*, the Court said both public officials and public figures must prove actual malice by "clear and convincing proof." 418 U.S. 323, 342 (1974). *Gertz* also held that a defamation plaintiff must prove actual injury to recover for a false and defamatory statement about a matter of public concern. *Id.* at 348-49. And in *Philadelphia Newspapers, Inc. v. Hepps*, the Court held that in cases involving speech about matters of public concern, the First Amendment requires all plaintiffs—public and private—to prove falsity. 475 U.S. 767, 776 (1986).[24] The plaintiff "carries the burden of showing that each allegedly defamatory statement is materially false." *Yohe v. Nugent*, 321 F.3d 35, 41 (1st Cir. 2003); *see*

---

[24] The *Hepps* Court reserved the question of whether its holding applies to non-media defendants, 475 U.S. at 779 n.4, a circumstance we do not face here. The Court also has not yet expressed a view on whether the element of falsity must be established by clear and convincing evidence or by a preponderance of the evidence. *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 661 n.2 (1989). Because we follow Colorado substantive law, the "clear and convincing" standard of proof articulated by Colorado courts applies here.

*also Rinsley v. Brandt*, 700 F.2d 1304, 1310 (10th Cir. 1983) (explaining that plaintiffs must "identify[] particular statements or passages that are false").[25] This includes claims for defamation by implication. *See Parks v. LaFace Records*, 329 F.3d 437, 462 (6th Cir. 2003) ("As with a traditional defamation claim, a plaintiff in a defamation-by-implication claim must establish a material falsity.").

2. **Material Falsity**

The foregoing Supreme Court decisions changed the manner in which courts treat a statement's truth or falsity. As we said in *Bustos v. A & E Television Networks*, "[w]here truth was once strictly a defense, now the plaintiff must shoulder the burden in his case-in-chief of proving the *falsity* of a challenged statement if he is a public figure or the statement involves a matter of public concern." 646 F.3d 762, 764 (10th Cir. 2011). The following outlines key aspects of the falsity analysis.

a. *Materiality*

The plaintiff must show the statement is not only false, but "materially false." *Id*. at 764, 767. "The law of defamation overlooks inaccuracies and focuses on

---

[25] *Rinsley v. Brandt*, 700 F.2d 1304, 1310 (10th Cir. 1983), addressed a false light invasion of privacy action rather than a defamation action. The Colorado Supreme Court has declined to recognize the tort of false light invasion of privacy, "concluding that it is highly duplicative of defamation both in interests protected and conduct averted." *Denver Pub. Co. v. Bueno*, 54 P.3d 893, 894 (Colo. 2002). As we noted in *Rinsley*, "[i]n most aspects . . . the two actions are similar." 700 F.2d at 1307. It is "essential to both a false light privacy claim and a defamation claim . . . that the matter published concerning the plaintiff is not true." *Id.* (citations and quotations omitted); *see also Bueno*, 54 P.3d at 899 (comparing the element of "falsity" as set forth in the Colorado Jury Instructions and concluding that the element "varies only slightly between the torts").

substantial truth." *Schwartz v. Am. Coll. of Emergency Physicians*, 215 F.3d 1140, 1146 (10th Cir. 2000). "[M]inor inaccuracies do not amount to falsity so long as the substance, the gist, the sting, of the libelous charge [is] justified." *Masson v. New Yorker Magazine*, 501 U.S. 496, 517 (1991); *accord Air Wisc. Airlines*, 134 S. Ct. at 861 (quoting *Masson*). *See Vachet v. Cent. Newspapers, Inc.*, 816 F.2d 313, 316 (7th Cir. 1987) ("The 'gist' or 'sting' of the alleged defamation means the heart of the matter in question—the hurtfulness of the utterance."). "Unless a statement contains a *material* falsehood it simply is not actionable." *Bustos*, 646 F.3d at 764 (applying Colorado law).[26]

For example, in *Bustos*, we held that reference to a prisoner as a "member" rather than an "affiliate" of a gang was not a material falsehood. 646 F.3d at 767.[27] In *Rinsley*, we held publishing that a child patient's parents had sued the plaintiff doctor when, in fact, they only consulted counsel about filing suit was an "inaccuracy" that "was too minor to be actionable." 700 F.2d at 1308. And in

---

[26] *See also Pan Am Sys., Inc. v. Atl. Ne. Rails & Ports, Inc.*, 804 F.3d 59, 68-69 (1st Cir. 2015) ("[A] statement need not be 100% true to be protected—if it is 'substantially true,' a defendant is safe."); *Price v. Stossel*, 620 F.3d 992, 1001 (9th Cir. 2010) ("*Masson* explained the common law principle that inaccuracies alone do not render a statement false if there remains 'substantial truth' to what was said[;] . . . the alteration [must] change[] the meaning in a material way.").

[27] *See also Bustos*, 646 F.3d at 764 ("A report that the defendant committed 35 burglaries when he actually committed 34" is not materially false. (citing *Liberty Lobby, Inc. v. Anderson*, 746 F.2d 1563, 1568 n.6 (D.C. Cir. 1984))); *id.* ("[A] report that mistakenly says that the plaintiff stabbed a man *in* Cheyenne, Wyoming when he really stabbed a man *from* Cheyenne, Wyoming" is not materially false. (citing *Gomba v. McLaughlin*, 504 P.2d 337, 338-39 (Colo. 1972))).

- 34 -

*Schwartz*, we held that a "technically inaccurate" statement that the plaintiff was "being sued for stock fraud" was nonetheless substantially true when the plaintiff was actually "being sued for making deceptive statements made relating to stock transactions." 215 F.3d at 1146-47.

"[A] statement is not considered false unless it 'would have a different effect on the mind of the reader from that which the pleaded truth would have produced.'" *Masson*, 501 U.S. at 517 (quoting Robert Sack, *Libel, Slander, and Related Problems* 138 (1980)). To be material, an alleged falsehood must be "likely to cause reasonable people to think 'significantly less favorably' about the plaintiff than they would if they knew the truth." *Bustos*, 646 F.3d at 765. "[A] misstatement is not actionable if the comparative harm to the plaintiff's reputation is real but only modest." *Id*. These passages from *Bustos* show that comparative harm to reputation bears on the material falsity analysis.

b. *Words out of context*

The *Brokers' Choice II* panel addressed another aspect of the material falsity analysis: "[a] publisher may be liable 'when it takes words out of context and uses them to convey a false representation of fact.'" 757 F.3d at 1137 (quoting *Dixson v. Newsweek, Inc.*, 562 F.2d 626, 631 (10th Cir. 1977). Thus, "an exact quotation taken out of context can distort meaning, although the speaker did use each reported word." *Masson*, 501 U.S. at 515; *see also Turner v. KTRK Television, Inc.*, 38 S.W. 3d 103, 115 (Tex. 2000) (collecting federal and state cases and explaining that "while all the statements in a publication may be true when read in isolation, the publication may

nevertheless convey a substantially false and defamatory impression by omitting material facts or suggestively juxtaposing true facts").[28]

c. *Omitting favorable information*

The omission of additional favorable information from an otherwise true publication does not render a statement materially false. "[T]he First Amendment prohibits a rule that holds a media defendant liable for broadcasting truthful statements and actions because it failed to include additional facts which might have cast plaintiff in a more favorable or balanced light." *Corp. Training Unlimited, Inc. v. Nat'l Broad. Co., Inc.*, 981 F. Supp. 112, 122 (E.D.N.Y. 1997) (quotations omitted) (citing *Machleder v. Diaz*, 801 F.2d 46, 55 (2d Cir. 1986), *cert. denied*, 479 U.S. 1088 (1987)). Thus, "[a]s long as the matter published is substantially true, the defendant [is] constitutionally protected from liability [based on falsity], regardless of its decision to omit facts that may place the plaintiff under less harsh public scrutiny." *Goodrich v. Waterbury Republican-American, Inc.*, 448 A.2d 1317, 1331 (Conn. 1982).

---

[28] *See also Turner*, 38 S.W. 3d at 115 ("[T]he omission of material facts or misleading presentation of true facts . . . can render an account just as false as an outright misstatement. . . . [T]he literal truth of each individual statement is not a defense in such cases."); *id.* (permitting liability for the "publication that gets the details right but fails to put them in the proper context and thereby gets the story's 'gist' wrong").

d. *Context as a whole*

As stated in *Brokers' Choice II*, determining whether a publication is materially false requires examination of the published statements in context, not in isolation. 757 F.3d at 1138; *see also Karedes v. Ackerley Grp., Inc.*, 423 F.3d 107, 114 (2d Cir. 2005) ("As to falsity, the accuracy of the report should be assessed on the publication as a whole, not isolated portions of it[.]" (brackets and quotations omitted)).[29] This is because, "[w]hile statements may appear to be true when viewed in isolation, we consider the entire context to determine if a false impression is projected[.]" *Brokers' Choice II*, 757 F.3d at 1137. As we stated in *Rinsley*, however, "[t]he proscription against reading statements out of context does not relieve a plaintiff from identifying particular statements or passages that are false." *Id.* at 1310. Courts may still "examin[e] the particular statements identified as objectionable for their truth or falsity . . . as long as the court reads them in context." *Id.*

### 3. **The First Amendment and Colorado Defamation Law**

As outlined above, *New York Times* and its progeny relied on the First Amendment to add "actual malice" as an essential element of a defamation claim

---

[29] *See also* Colo. Jury Instr., Civil 22:11 (April 2016) ("In determining the meaning of a statement . . . you must consider the [broadcast] as a whole. You must not dwell upon specific parts of the [broadcast].") *Price*, 620 F.3d at 1002 (explaining that to follow *Masson*, the proper analysis must "compare[] the meaning conveyed by the [c]lip as broadcast with the meaning of [the plaintiff's] own words in the context of the sermon he actually delivered").

when the defendant is a public official or public figure and "material falsity" when the alleged misstatement is a matter of public concern. Colorado law goes further. For statements relating to matters of public concern,[30] all plaintiffs, public or private, must prove actual malice, *see Diversified Mgmt., Inc. v. Denver Post, Inc.*, 653 P.2d 1103, 1105-06 (Colo. 1982); *Quigley v. Rosenthal*, 327 F.3d 1044, 1058 (10th Cir. 2003), and they must prove the defamatory statement is materially false by "clear and convincing evidence," *see Bustos*, 646 F.3d at 764 (citing *Smiley's Too, Inc. v. Denver Post Corp.*, 935 P.2d 39, 41 (Colo. App. 1996)); *McIntyre v. Jones*, 194 P.3d 519, 524 (Colo. App. 2008). *See also* Colo. Jury Instr., Civil 22:2, 22:13 (Apr. 2016).[31]

Accordingly, under the First Amendment and Colorado law, a defamation plaintiff must prove that a statement involving a matter of public concern was:

(1) Defamatory,

(2) Materially false,

(3) Concerned the plaintiff,

(4) Published to a third party,

---

[30] A matter is of public concern "whenever it embraces an issue about which information is needed or is appropriate, or when the public may reasonably be expected to have a legitimate interest in what is being published." *Spacecon Specialty Contractors, LLC v. Bensinger*, 713 F.3d 1028, 1035 (10th Cir. 2013) (quoting *Williams v. Cont'l Airlines, Inc.*, 943 P.2d 10, 17 (Colo. App. 1996)).

[31] *Wade v. Olinger Life Ins. Co.*, 560 P.2d 446, 452 n.7 (Colo. 1977) ("In the absence of authority to the contrary, the legal principles [articulated] in the [Colorado Jury Instructions] should be considered persuasive.").

(5) Published with actual malice, and

(6) Caused actual or special damages.[32]

*See Fry*, 2013 WL 3441546, at *4; *Han Ye Lee v. Colorado Times, Inc.*, 222 P.3d

957, 961 (Colo. App. 2009) (citing, among others, *Williams v. Dist. Court*, 866 P.2d

908, 911 n.4 (Colo. 1993)); *see also* Colo. Jury Instr., Civil 22:2 (April 2016).

4. **Material Falsity and Substantial Truth**

This appeal concerns only the material falsity element. Both the district court

and the *Brokers' Choice II* panel have varied between describing the issue as whether

the *Dateline* episode was false or whether it was true.[33] Substantial truth, not

---

[32] After *Gertz,* states may permit recovery of presumed or punitive damages in a case involving a matter of public concern only when the plaintiff has proved actual malice. 418 U.S. at 349; *see also Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 751, 756 (1985) (plurality). A defamation plaintiff is otherwise limited to compensation for "actual injury." *Id.* at 349. Although *Gertz* did not define "actual injury" and reserved the framing of "appropriate jury instructions" to trial courts, the Court noted that "actual injury" includes "impairment of reputation" and "personal humiliation, and mental anguish and suffering" in addition to "out-of-pocket" loss. *Id.* at 349-50.

Consistent with *Gertz*, plaintiffs asserting a defamation claim under Colorado law regarding a matter of public concern must prove "actual damage" when the publication is libel per se—libelous on the publication's face—and "special damages" when it is libel per quod—libelous based on extrinsic facts. Colo. Jury Instr., Civil 22:1 (Apr. 2016); *id.* at 22:2; *see also Keohane v. Stewart*, 882 P.2d 1293, 1304 (Colo. 1994) (per se); *Gordon v. Boyles*, 99 P.3d 75, 79 (Colo. App. 2004) (per quod).

We do not delve further into defamation damages because doing so is not necessary for purposes of this appeal.

[33] *See Brokers' Choice II*, 757 F.3d at 1132 (explaining the court must "decide whether the aired program gave a false impression of [Mr. Clark's] seminar; in other words, whether the segment was not substantially true"); *id.* at 1138 (explaining that BCA would be defamed if the comparison "show[ed] the aired statements to have left

Continued . . .

absolute or literal truth, is the standard for the affirmative defense of truth to a defamation claim—"it is sufficient if the substance, the gist, the sting, of the matter is true." *Gomba v. McLaughlin*, 504 P.2d 337, 338-39 (Colo. 1972); *see also Vachet v. Cent. Newspapers, Inc.*, 816 F.2d 313, 316 (7th Cir. 1987) ("The 'gist' or 'sting' of the alleged defamation means the heart of the matter in question—the hurtfulness of the utterance."). But, as explained above, the First Amendment, as applied in *New York Times*, *Gertz*, *Hepps*, and *Masson*, requires the plaintiff to prove material falsity, which is now accordingly an essential element of a defamation claim. *Bustos*, 646 F.3d at 764 ("Where truth was once strictly a defense, now the plaintiff must shoulder the burden in his case-in-chief of proving the *falsity* of a challenged statement if he is a public figure or the statement involves a matter of public concern.").

The distinction between material falsity and substantial truth affects the allocation of the burden of proof. Although defendants bear the burden of showing substantial truth to establish the affirmative defense, *see Gomba*, 504 P.2d at 339 (quoting Colorado jury instructions), plaintiffs must prove material falsity as part of their case-in-chief, and in Colorado they must do so by clear and convincing

---

viewers with a false impression of the gist of Clark's seminars (were not substantially true)"); *Brokers' Choice III*, 138 F. Supp. 3d at 1215 (concluding "the comparison did not . . . show the aired statements would have left viewers with a false impression of the gist of Clark's seminars. Instead, *Dateline*'s portrayal of what occurred at the seminar was, in fact, 'substantially true'"); *id.* at 1203 (describing BCA as arguing that the episode was "substantially false").

evidence.[34] *Bustos*, 646 F.3d at 764; *McIntyre*, 194 P.3d at 524. This allocation may matter at trial, *Lederman v. Frontier Fire Prot., Inc.*, 685 F.3d 1151, 1155 (10th Cir. 2012) (stating that "burdens of proof are almost always crucial to the outcome of the trial" (quotations omitted)), and at summary judgment, *see Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986) (explaining that a defamation plaintiff's heightened, clear and convincing burden at trial is relevant to a summary judgment determination); *Bustos*, 646 F.3d at 764 (considering the clear and convincing standard in review of summary judgment).

Here, however, we review the district court's Rule 12(b)(6) dismissal of BCA's amended complaint. As we stated in *Brokers' Choice II*, BCA would bear the burden at trial of showing by clear and convincing evidence that the *Dateline* program was materially false as to them. 757 F.3d at 1138 (explaining that at trial "[i]f that comparison were to clearly and convincingly show the aired statements to have left viewers with a false impression of the gist of Clark's seminars (were not substantially true) he has been defamed by *Dateline*, otherwise he has not."). But we do not need to consider whether that burden should affect our analysis. "The essence of [the] inquiry . . . remains the same whether the burden rests upon [the] plaintiff or defendant." *Masson*, 501 U.S. at 517. Our de novo review of NBC's challenge to the amended complaint compares the recording of the Annuity University seminar

---

[34] As one commentator succinctly put it, "the [Supreme] Court has switched the burden of proof on falsity." David A. Anderson, *Is Libel Law Worth Reforming?*, 140 U. Pa. L. Rev. 487, 504 (1991).

with the *Dateline* program and leads us to conclude that the program was not materially false without having to take into account at this procedural posture that the law allocates to the plaintiff the burden of proving falsity by clear and convincing evidence.

In that limited sense, we agree with Plaintiffs' counsel, who said at oral argument that it makes no difference whether we address the issue presented here as whether the *Dateline* program was materially false or substantially true. Oral Arg. at 1:43-2:59; *see Fry*, 2013 WL 3441546, at *11-12 (affirming dismissal of a defamation claim based on substantial truth and failure to plead material falsehood); *see also Masson*, 501 U.S. at 517 ("The essence of the inquiry . . . remains the same whether the burden rests upon plaintiff or defendant.").[35] Accordingly, the law on what constitutes material falsity guides our analysis.

\* \* \* \*

In sum, the statements at issue in the *Dateline* episode, when viewed in context, must be materially false to be actionable. That means: (1) "minor inaccuracies" do not count, *Masson*, 501 U.S. at 517; (2) the episode must be "likely to cause reasonable [viewers] to think 'significantly less favorably' about the plaintiff[s] than they would if they knew" what was actually presented at the Annuity University seminar, *Bustos*, 646 F.3d at 765; and (3) if a "misstatement" from the

---

[35] *See also Pardo v. Simons*, 148 S.W. 3d 181, 186 (Tex. App. 2004) ("Courts use the 'substantial truth' test to determine whether a statement is false").

episode caused only "modest [reputational] harm," it is not actionable, *id.* at 765. We call this the "*Masson/Bustos* standard" in the remainder of this opinion.

## C. *Analysis*

With this legal framework in mind, we proceed to address whether BCA's amended complaint sufficiently alleged that the statements of public concern in the *Dateline* episode were materially false.[36] To do so, we compare the *Dateline* episode with the Annuity University seminar.

In *Brokers' Choice II*, the panel said the *Dateline* episode must be evaluated as a whole and compared with the full context of the seminar. 757 F.3d at 1138. The panel said the "gist" of the episode was that "Clark teaches insurance agents to scare and mislead seniors into buying unsuitable insurance products," *id.*, and the question is whether the gist is substantially true when compared with the seminar, *id.* at 1132. Our analysis proceeds in three parts.

First, as the district court did, we examine the seminar recording to determine the purpose of the seminar. Although the seminar may have had more than one purpose, we think a main purpose was to teach agents how to sell annuities to seniors and become wealthy. This purpose is a significant part of the context of the seminar and is consistent with the gist of the episode.

---

[36] As we explained in *Brokers' Choice II*, "[t]he district court concluded the *Dateline* program addressed an issue of public concern; BCA does not challenge the conclusion in this appeal." 757 F.3d at 1136 n.7. The district court made the same finding in *Brokers' Choice III*, 138 F. Supp. 3d at 1197, and BCA similarly does not challenge that conclusion in the present appeal.

Second, we compare the gist of the episode to the seminar.[37] The *Brokers'*

*Choice II* panel called for this approach, which was also followed in this court's

*Bustos* decision. *See* 646 F.3d at 767 ("We must . . . compare [the broadcast's]

statement against the truth of the matter."). Our analysis breaks the gist into three

elements—teaching agents to (1) scare and (2) mislead seniors into (3) buying

unsuitable annuities. As to each gist element, and recognizing that the elements

overlap, we examine the episode's statements from which the element is drawn to

inform our comparison of the gist with the seminar. This exercise shows the episode

was not materially false.

Third, we consider the particular statements from the episode that BCA alleged

are false and defamatory. We address whether they are materially false by examining

them in the context of both the episode and the seminar. This analysis is necessary to

ensure we have considered all the allegations in the amended complaint. Doing so is

consistent with *Brokers' Choice II* and the approach followed in the Supreme Court's

*Masson* decision. *See also Celle*, 209 F.3d at 187-89; *Chapin*, 993 F.2d at 1093-98;

---

[37] Like the district court, we compare the episode and the seminar recording. Contrary to BCA's argument, this does not involve weighing evidence. We consider the seminar and the episode as understood by a reasonable person. *Bustos*, 646 F.3d at 767 (material falsehood must be "likely to cause reasonable people to think 'significantly less favorably'" of the plaintiff than if they knew the truth).

*Blair v. Inside Ed. Prods.*, 7 F. Supp. 3d 348, 359-62 (S.D.N.Y. 2014).[38] This exercise also shows the episode was not materially false.

1. **Purpose of the Seminar**

The district court properly followed *Brokers' Choice II*'s direction to compare the *Dateline* episode's gist with the seminar as a whole. We do the same here. Our analysis consists primarily of evaluating whether statements in the *Dateline* episode were materially false when considered in the full context of the seminar. But the district court recognized, as do we, that an important part of the seminar's context was its purpose. We start there.

The recording shows a main purpose of the seminar was to teach insurance agents how to sell annuities and become wealthy. This is consistent with the gist of the episode that "Clark teaches insurance agents to scare and mislead seniors into buying unsuitable insurance products." 757 F.3d at 1138.

Although the seminar taught attendees about annuity products and financial planning topics relevant to seniors, Mr. Clark explained that it would concentrate on how to sell annuities. He identified this objective at the outset: "I'm just saying that's that—you're here essentially to make money; is that true? I mean, you want to do better, make more money." Recording Tr. Day 1 at 3. He told attendees: "You

---

[38] *See also Price*, 620 F.3d at 1002-03 (characterizing *Masson* as requiring the district court to "compare[] the meaning conveyed by the Clip as broadcast with the meaning of [the plaintiff's] own words in the context of the sermon he actually delivered" and stating that "the proper comparison [under *Masson*] is between the meaning of the quotation as published and the meaning of the words as uttered").

didn't come out here to learn about annuity products but you will learn some.  You

came out here to learn how to sell annuities, how to run your business and so forth."

*Id.* at 6.

During the seminar, Mr. Clark described how selling annuities could be

lucrative:

- "[I]t's not going to be uncommon for agents to write 30 to a hundred million in premium[s]" by selling annuities.  *Id.* at 5.

- "We had a gentleman here last month who wrote over a hundred million of premium[s].  A hundred million."  *Id.*

- "So if you guys really want—listen, there's no excuse as to why you're not wealthy.  There's no excuse for you not being wealthy.  There really isn't.  Okay?"  *Id.* at 198.

He explained that agents' own confidence was their main obstacle to selling

annuities:

- "If you want to get to 30, 40 million of premium[s], you want to get to 10 million, the limitations that exist are the ones that are in your brain."  *Id.* at 19.

- "[Y]ou're inches, inches, inches away—inches away from accomplishing this and writing 10-million-a-year [in] premium[s].  You have to believe that.  And then you have to start saying, I can do it, I can to [sic] be it, I can do it.  And you can do it."  Recording Tr. Day 2 at 105.

Mr. Clark also emphasized how he had helped others become wealthy by

teaching them how to sell annuities:

I have trained more millionaires in the annuity industry than anybody in America.  There is no other individual.  By the way, I know all the top producers.  Most of them, I started them, and I trained them, or I did their seminars.  I made more millionaires in this business than anybody.

- 46 -

Recording Tr. Day 1 at 3.  Mr. Clark stressed the value of his advice.  For example, describing his successful seminar model, he said:  "It's a masterpiece.  The seminar has produced about eight billion in sales.  That's a real number.  So the seminar works like a machine.  Works like a machine."  *Id.* at 151-52.[39]

BCA's amended complaint described the seminar as an "educational course" for agents to understand the features of annuities so they could determine "suitable fit" for customers.  Am. Compl. at 7, ¶ 24.  Although Mr. Clark and other speakers discussed annuity features and financial planning topics in the seminar—"you will learn some"—[40] and Mr. Clark told attendees their annuity knowledge would give them confidence to boost their sales,[41] BCA's description did not include Mr. Clark's own characterization of one of the seminar's main purposes:  to teach agents how to sell annuities and get rich—a purpose aligned with the *Dateline* episode's gist.

---

[39] *See also* Supp. App. at 1218 ("[T]his is the process here and it works like a machine.  It's like printing money.").

[40] For example, throughout the seminar, Mr. Clark quizzed attendees on what he deemed the six characteristics of an annuity:  "And an annuity—there's six features—remember when I said I want you to understand the language?  I want you to memorize the six features of an annuity:  safety, liquidity, tax advantages, competitive returns without risk, probate avoidance, and you can still structure the annuity to protect the asset from a nursing home spend-down.  Nursing home benefits."  Recording Tr. Day 1 at 65.

[41] Mr. Clark stated:  "So an annuity is a multifaceted planning tool . . . .  And the better that you know and understand this, the more sales you're going to make, the more sales you're going to save, the better you are going to be in your seminars and more conviction and confidence you're going to have."  *Id.* at 55.  He also said an agent could win over a client from a competitor by impressing the customer with the agent's knowledge of the product.  *Id.* at 62-63.

The ensuing analysis evaluates whether statements in the episode were materially false when considered with the full context of the seminar, including its objective to help attendees sell annuities and get rich.

2. **Comparing the Gist of the Episode and the Seminar**

As noted above, the *Brokers' Choice II* panel identified the "gist" of the *Dateline* episode as follows: "Clark teaches insurance agents to scare and mislead seniors into buying unsuitable insurance products." 757 F.3d at 1138. We focus here on whether the gist of the episode conveyed a materially false depiction of the seminar's content under the *Masson/Bustos* standard. After comparing the episode with the seminar recording, we agree with the district court that the gist of the episode was not materially false. To reach this conclusion, we compare statements about BCA in the episode that underlie the gist with the whole two-day seminar. *Id.* at 1132; *Price v. Stossel*, 620 F.3d 992, 1002 (9th Cir. 2010) (explaining that a proper analysis must compare the episode with the meaning of plaintiff's own words in the context of the presentation he actually delivered). Although the elements of the episode's gist overlap—for example, scaring seniors can include misleading them, and misleading seniors can concern the suitability of annuities—we organize this discussion by grouping statements from the episode in the categories listed in the gist.

a. *"Scare seniors"*

i. <u>The episode and the seminar</u>

- 48 -

The *Brokers' Choice II* panel described the gist of the *Dateline* episode to include that Mr. Clark "[taught] insurance agents to scare . . . seniors into buying unsuitable insurance products." 757 F.3d at 1138. We focus here on the "scare seniors" part of the gist.

Episode. The *Dateline* episode stated Mr. Clark's seminar taught agents to use "scare tactics" to convince seniors to buy annuities, such as "suggest[ing] their money may not be safe, even in a bank" or mentioning "a senior's natural fear of nursing homes." *Dateline* Tr. at 8.

BCA alleged the episode was materially false because Mr. Clark did not teach agents to use scare tactics. Am. Compl. at 30-31, ¶ 89. Rather, BCA's amended complaint characterized Mr. Clark as teaching agents to "uncover[]" important issues—not fears—to determine if an annuity is a suitable product for the client. *Id.* at 8, ¶ 26; *id.* at 31, ¶ 91. The seminar recording contradicts and supplants these allegations.

Seminar. At the seminar, Mr. Clark presented a formula to sell annuities: (1) bond with clients to establish credibility, (2) discover a potential client's emotionally based problems, and (3) solve that problem by selling an annuity. Recording Tr. Day 1 at 152.[42] Mr. Clark explained that the kinds of problems that

---

[42] Mr. Clark summarized the approach as follows: "The first thing . . . is you're going to have to bond with that person. Then you're going to have to establish credibility with that person. Then you're going to have to open up that person where they open up to you. And then you're going to look for, uncover, discover their problems. Then you're going to solve their problem. Then you're

Continued . . .

- 49 -

lead to sales have an emotional root; the problem should "disturb the hell out of" the prospective client. *Id.* at 75. He said that he "bring[s] out the stuff when they can't sleep at night," *id.*, and taught agents how to "strike at the heart of a prospect," *id.* at 155.

> Mr. Clark explained:

> When it comes to making a sale . . . this is what has to take place. It has got to be—it has to be an emotional experience, it has to be, because that's the only time when a person is going to make a decision.

*Id.* at 35.[43] He went on:

> Where's the client's problem? Okay. And if that's not an emotionally based problem, you have no sale. There is not going to be a sale. You uncover and you discover problems. That's what we do. And then we solve those problems.

*Id.* at 75. He made clear these problems are widespread:

> [E]veryone out there you talk to typically has a tax problem, they have an investment problem, they have health problems, they have an estate planning problem, they have a family problem. They all have problems. That's what my seminar is all about.

*Id.* He advocated identifying such a problem and using the following strategy:

> My seminar is bringing forth as a—in as articulate manner as possible, based on the way they think and the way they say their problems, and then I have empathy, and then I relate to every one of my audiences. Okay? And I bring these things out that disturb the hell out of them.

---

going to get them to make a decision about that problem, close, and then you're going to seal the sale." Recording Tr. Day 1 at 152.

[43] Another speaker at the seminar similarly explained: "Don't rely on a PowerPoint or the product itself to sell people. You have to—people buy on what? . . . . Emotion." Recording Tr. Day 2 at 182.

> That's what I do in my workshop. Not by putting—or making them so fearful. I bring out the stuff when they can't sleep at night.

*Id.* Mr. Clark explained this approach leaves the prospects feeling that they need him to solve their emotionally based problems akin to a cancer patient's need for a doctor:

> It's kind of like this: If the doctor said, you know, I'm sorry, you have cancer. You need to—you need to come to the office as soon as you can. Man, you're going to be there. That's fear. The presentation should have that impact. It should have that impact.

Recording Tr. Day 2 at 104.[44]

Mr. Clark gave examples of the effective use of emotionally-based problems to appeal to prospects. As discussed further below, he stated that nursing homes can drain savings to the point of bankruptcy. He presented a hypothetical in which a disfavored son-in-law divorces the prospect's daughter but manages to walk away with half of her inheritance.[45] He also suggested appealing to prospects' desires to

---

[44] Mr. Clark stated the potential clients have "already made the decision that they need you and the workshop because I bring up stuff that is very disturbing." Recording Tr. Day 1 at 151.

[45] Mr. Clark described presenting the following scenario to prospects: "And worst of all, it's going to go into their marital accounts, and your son or daughter have a 50 percent chance of their marriage ending in divorce. And you hear them— now I've really got them going. Now, that son-in-law has turned into the outlaw in-law, and he divorces your daughter, he's able to walk away with half of the inheritance. He marries someone else that has children of her own. So guess who ultimately ends up with those assets? The new spouse's children. Wouldn't you like to meet these kids? You know, if they're going to end up with—with what took you a lifetime to build, all those 40 years of work are going to end up in some stranger's children's hands—how did that happen? How did that happen? Have I affected them? Big time." *Id.* at 32. He went on to tell attendees that he presented this "not [as] fancy sales techniques" but as "some flavor of—of information, but it's true

Continued . . .

- 51 -

prevent their children from wasting their inheritances.[46] He stated that, without an

annuity, the children would likely spend the client's life savings within nine months[47]

and that he has seen families fall apart and not talk to each other for years because of

how assets were inherited.[48] For example:

> I got some stuff so powerful, so powerful, because I'll say, you know what, ladies and gentlemen, how would you feel if you knew that you were the cause of family conflict, divorce, and bankruptcy in your family, and you caused it? How would you feel about that? Probably miserable. Can that happen? It can happen in the manner that you leave your assets to your children.

---

information. It's not fancy sales techniques. It's for real." *Id.* He again emphasized that annuities are the "real deal" and that none of his clients had lost any money. *Id.*

He similarly explained that a child's ex-spouse could walk away with half of the inheritance if the senior conveyed it in the form of a home, rather than an annuity: "And once [the child sells the home], if there was a divorce . . . . Sorry there's nothing you can do about it and nothing the other kids can do about it. Boy, does this stir up emotions, and it should. They'll—when they leave the seminar, they can't stop thinking about what I just said. . . . You know what, I just hooked them right now is what I did." *Id.* at 143.

[46] "If you really want to strike at the heart of a prospect, ask them if they have children that intend to spend their money as soon as they get it. And there's nothing that they want more is to know—to know that their children will be financially secure when they're no longer here. They'll buy an annuity just for this feature, just for this benefit. Nothing else." *Id.* at 155-56.

[47] "I say, folks, 78 percent of the assets that is [sic] inherited by the Baby Boom generation will spend those assets within nine months. So what took you a lifetime to build, when it gets in their hands, it's gone, the majority of it, within nine months. You hear the room just chatter, chatter, chatter, chatter. I impacted them emotionally." *Id.* at 31.

[48] "It wasn't your intention, but the way you leave assets to your kids could end up in a grudge with your children. I've seen families never talk to each other for years because of the way their parents have left the assets to them. That disturbs the heck out of them." Recording Tr. Day 2 at 104-05.

Recording Tr. Day 2 at 104.[49]  For each example, Mr. Clark provided a detailed,

emotional narrative the agent could use to "disturb the heck out of [the prospect]."

*Id.* at 105.  *See also Brokers' Choice III*, 138 F. Supp. 3d at 1203-05 (excerpting

narrative examples).

As part of promoting annuities to solve these problems, Mr. Clark presented

examples of protecting "clients' life savings from the nursing home and Medicaid

seizure of their assets."  *Id.* at 110.  Telling attendees to memorize "what [he's]

accomplished for [his] clients," he said:

> I help my clients to protect their life savings from the nursing home and
> Medicaid seizure of their assets.  See, that's scary, and it should be
> scary, Medicaid seizure, because they do seize their assets.  They force
> them to spend it all down.  I protect my clients' life savings from the
> nursing home and Medicaid seizure of their assets.

*Id.* at 111-12.[50]  He described Colorado law as making asset seizures of this kind

plausible:

> If you run out of money in a nursing home in this state, they will put a
> lien on your house, and the State will inherit the home, not your family.
> See, I just—I just got half of the whole room right there, didn't I, before
> I started my seminar.

---

[49] *See also id.* at 105 ("I said, ladies and gentlemen, how would you feel—remember that's an emotional question.  How would you feel if you discovered that you were the cause of family conflict, family divorce, and even bankruptcy?  And guys, what I'm telling you is real.  It's the real thing.").

[50] *See also* Recording Tr. Day 1 at 73 (Mr. Clark explained he can "structure the annuity to protect it from the nursing home.").

*Id.* at 112.  But because of annuities, "[t]hat does not, has not, and will not happen with my clients."  *Id.* at 110.

Comparison.  As the foregoing shows, Mr. Clark instructed seminar attendees to seek out and leverage seniors' emotions to make sales.  He encouraged them to use "fear" and to "disturb" prospective clients to sell annuities.  He gave examples of emotional problems that are particularly effective to probe seniors' fears.  Comparing his seminar statements to the episode, we conclude the episode's description of these methods as "scare tactics" was not materially false.

       ii.     BCA's arguments

BCA argues that Mr. Clark "stressed 'truth and facts'" and "taught agents to care about their clients."  Aplt. Br. at 30-31.  But even if this is so, it does not erase his advocacy of scare tactics or undercut the other parts of the gist.

As BCA points out, the seminar recording shows that Mr. Clark encouraged attendees to use "truth and facts" to sell annuities.[51]  For example, he said:

---

[51] Mr. Clark explained that using "truth and facts" and demonstrating "care" would increase sales.  *See, e.g.*, *id.* at 38 ("If you want me to do business with you, what value are you bringing to the table? . . .  You're bringing your honesty, and you bring in your ethics, and you bring in your trust, and you bring in your care about your client. . . .  And when you feel—feel that way, the psychology changes in the sales process.  They want you instead of you trying to beg them to like or want you."); *id.* at 99 (explaining that the sales process came down to "whether [prospects] like you and whether they trust you. . . .  You know, if you've met somebody that was cold and standoffish and didn't seem to care about you, would you want to do business with them?"); *id.* at 13 ("How am I going to—how am I going to turn you into a multimillionaire, mega million dollar producer?  It's not because annuities are great.  Here's how you sell them.  Here is how you bring people to you.  It comes
Continued . . .

Now, this is very, very important. Let me tell you why. Because if you sell based on truth, based on facts, you're right with yourself, within yourself. You have the right motives. Okay? You're not selling smoke and mirrors. You're not selling garbage. You want to do the best job you can for your client based on truth, based on facts.

*Id.* at 31; Recording Tr. Day 1 at 13.[52] The seminar provided "truth and facts"

attendees could use:

I have something that's the best thing there is to deliver to people, to deliver to you guys: I have truth, and I have facts to deliver to you. That is true. I'm living proof of it.

*Id.* at 39.

Mr. Clark also instructed agents to demonstrate care and bond with the client

as part of the formula to use scare tactics to close the sale:

The first thing that's going to have to take place is you're going to have to bond with that person. Then you're going to have to establish credibility with that person. Then you're going to have to open up that person where they open up to you. And then you're going to look for, uncover, discover their problems.

*Id.* at 152. "And to be really good at bonding depends on if you care about that

person and they can tell that." Recording Tr. Day 2 at 95.

_____

from within you. What's in your heart. Do you care about people? Do you care about their well-being?").

[52] Mr. Clark also encouraged attendees to buy an annuity for themselves, *id.* at 41-42, to "become experts at annuity contracts," *id.* at 48, and to be experts in various areas of retirement planning, Recording Tr. Day 2 at 91, to successfully sell annuities. He said: "[I]f you become experts in these areas, you guys are going to be very wealthy, you're going to have job security." *Id.*

As BCA points out, Mr. Clark told attendees to use "truth and facts" and to demonstrate care for clients. But this did not exclude his teaching the use of scare tactics—or the other tactics referenced in the episode—to complete the sale. To the extent the episode omitted or downplayed Mr. Clark's seminar comments on the agent's use of truth, facts, or caring, the reasonable viewer would not be "likely" to think "significantly less favorably" about BCA in light of the context of the overall seminar, which was replete with Mr. Clark's references to scare tactics as a tool to sell annuities and get rich. *Bustos*, 646 F.3d at 767.

### iii. Conclusion

Mr. Clark instructed seminar attendees to exploit seniors' emotions and to use "fear" to make sales. He explained that prospective clients should feel that they need the agent to solve their emotionally based problems like a cancer patient needs a doctor. *See* Recording Tr. Day 2 at 104. His mention of using "truth and facts" and of demonstrating care for clients did not expunge his advocacy of scare tactics at the seminar. The episode's "scare seniors" gist was not materially false.

### b. *"Mislead seniors"*[53]

### i. The episode and the seminar

---

[53] As stated above, the district court interpreted "mislead seniors" to include only the episode's discussion of "misleading credentials." *Brokers' Choice III*, 138 F. Supp. 3d at 1213-15. We think the "mislead seniors" part of the gist is broader and analyze it accordingly.

As explained above, the *Brokers' Choice II* panel described the gist of the *Dateline* episode to include that Mr. Clark "[taught] insurance agents to . . . mislead seniors into buying unsuitable insurance products." 757 F.3d at 1138. The "mislead" part of the gist concerns statements in the episode about (1) teaching agents to inflate their credentials, (2) teaching agents to deflect annuity criticisms, and (3) commentary from Minnesota Attorney General Swanson stating that Mr. Clark was not telling agents the truth about the liquidity of annuities.

### 1) Inflate credentials

Episode. The *Dateline* episode stated: "At Annuity University, Dateline discovered part of an underground industry that helps insurance agents puff up their credentials and mislead [seniors] about who they really are." *Dateline* Tr. at 9. The episode then showed hidden camera footage from the seminar showing that agents were taught they could pay to be listed on the cover of a financial book to "look like a respected author,"[54] to "pretend[]" to be an "author" of another book called "Alligator Proofing Your Estate,"[55] or "pretend to be a guest" on a pre-scripted radio

---

[54] This portion of the episode showed hidden camera footage from a break in the Annuity University seminar presentation, in which a *Dateline* producer spoke with Richard Duff about putting his "name on the cover of one of [Mr. Duff's] financial books." *Dateline* Tr. at 9. The episode explained that the name placement was in exchange for "writ[ing] a short biography" and "giv[ing] him a few thousand dollars." *Id.*

[55] The episode showed an online advertisement and stated: "At Annuity University, this ad says you can be the author of a book called 'Alligator Proofing Your Estate.'" *Id.* It stated that "agents like the idea of pretending to be authors,

Continued . . .

show to "help impress customers."  *Id.* at 9-10.  Mr. Hansen stated that "Attorney General Swanson says tactics like that can lead to abuse."  *Id.* at 10.  Attorney General Swanson concluded the segment by commenting:  "He is basically handing [attendees] loaded guns so they can walk into the senior's home and rip them off."  *Id.*

Seminar.  At the seminar, the second day included a lengthy presentation by Jeff Hoyle, director of Sundance Public Relations, BCA's public relations arm.  Mr. Hoyle's role was to help agents build their brand and business image.  Recording Tr. Day 2 at 16.  He told agents they must build credibility with potential clients and should aim to "reach" their audience six times to be remembered.  *Id.* at 20, 29.

In addition to other services, Mr. Hoyle described a Sundance Public Relations marketing opportunity called "Response Radio."  *Id.* at 40.  It is a "pretty scripted radio show, for lack of a better word" "based on a show that [Mr. Clark] did about a year and a half ago."  *Id.*[56]  "[Y]ou purchase the product [for $1,995], we send you the script, you go through the script, make any changes that you like.  Then we schedule for you a preproduction meeting with our gentleman who does all the radio

because Dateline found copies of the same 'Alligator' book supposedly co-written by" four individuals.  *Id.*

[56] Mr. Hoyle explained that agents can make changes to the script:  "The nice thing about it being prescripted is that if you purchased the product and received the script and there is something in the script that you don't want to talk about, take it out, change it . . . .  You know, we want it to be your piece because we want it to be customized for you for your use."  Recording Tr. Day 2 at 40.  He emphasized "We're very flexible in terms of making it a piece that you want."  *Id.* at 41.

magic, if you will." *Id.* at 41, 45. The agent records the dialogue as if it were a radio interview. *Id.* at 41-42. The "recording is done as if you were the call-in guest on a syndicated show in [sic] Senior Concerns." *Id.* at 42.[57] A producer edits the recording "for radio airplay. So if you wanted to walk into a radio station and offer this piece to them and buy an hour of airtime, all they have to do is plug it in." *Id.*[58] He explained agents could get a secondary benefit by representing to potential clients that they were on a radio show and handing out the recording on a CD to them. *Id.* at 50. The radio service, he said, "is just that little extra credibility that you can add." *Id.*

In addition to the radio offering, the seminar recording showed agents were taught they could pay to have articles written on their behalf or to be portrayed as having a substantial role in authoring a book.

Mr. Hoyle discussed "ghost-written articles" that agents could pay to have written and then submit to local publications:

> But if you don't want to take the time to write the article, then just give me a call, and we can write it for you. We can write it in whatever context you want it written in on pretty much whatever topic you want it written on.

---

[57] Mr. Hoyle continued: "And Senior Concerns is a copyrighted show we own the copyright to. How convenient, right?" *Id.* at 42.

[58] Mr. Hoyle answered a question about how to purchase airtime from radio stations and said: "Well, the fact of the matter is that you really can't get a guarantee to play [the recording] unless you purchase the time." *Id.* at 48-49.

*Id.* at 52-53. After discussing ghost-written articles, Mr. Hoyle briefly mentioned that "[w]e also do coauthored books." *Id.* at 54. He stated:

> We have one that has been primarily exclusive to [another] program called 'Alligator Proofing your Estate,' which I think we're going to try and broaden into the mainstream of everybody . . . .

*Id.* He added that a new coauthored book would soon be available. *Id.* The seminar contained no further description of the "coauthored" books referenced by Mr. Hoyle.

The seminar recording also showed other "customizable" financial books available to attendees. The second day of the seminar included a presentation from Richard Duff, who was introduced as an attorney, author, teacher, and trainer. *Id.* at 2-3. During a break in the seminar, one *Dateline* producer approached Mr. Duff to ask about his "customizable" financial books. Recording Tr. with Presenter at 2. Mr. Duff responded that the books could be tailored to list the agent as an author and would include a short chapter to be written by the agent. *Id.* at 2-3. He said: "[W]e can work out the covers. We can even change the title. So your pictures go on the back." *Id.* at 2. He explained:

> And it is—your first chapter, there is room for five or six, seven pages all about the way you're looking at things, your phone numbers, contact information and your seminars . . . . You know, I came into business because of this. And that's—and I could help you with—I will help you with it, but you've got to write it.

*Id.* at 3-4.

Comparison. As the episode described, the prescripted radio show and ghost-authored articles marketed by Mr. Hoyle and the "customizable" financial books offered by Mr. Duff show that Annuity University offered agents the opportunity to

pay for marketing that overstated their roles as interviewees or authors. Mr. Hoyle

also offered attendees the option of "coauthored" books, including the "Alligator"

book mentioned in the episode. The agents were urged to use these products to build

credibility with seniors, thereby misleading them with inflated credentials. Attorney

General Swanson's comment was stronger than the episode's earlier characterization

of Annuity University as "help[ing] insurance agents puff up their credentials and

mislead [seniors] about who they really are," *Dateline* Tr. at 9, but did not go so far

as to render the gist materially false.[59]

## 2) Deflect annuity criticisms

Episode. The episode showed a meeting between an insurance agent who was

an Annuity University graduate and a senior whom *Dateline* had recruited to pose as

a potential client. The agent used Mr. Clark's "very same pitch" taught at the

seminar that clients would have "easy access to their money." *Id.* at 11. When

pressed about annuity surrender charges, the agent answered "fast" and changed the

subject to address taxation of the withdrawal. *Id.* at 12. Mr. Hansen narrated that the

---

[59] Attorney General Swanson's comment is also non-actionable because it is "loose, figurative, or hyperbolic language" that cannot "reasonably be interpreted as stating actual facts." *Milkovich*, 497 U.S. at 21-22. It therefore receives constitutional protection. *Id.*; *see also Gardner v. Martino*, 563 F.3d 981, 990 (9th Cir. 2009); *Phantom Touring, Inc. v. Affiliated Publ'ns*, 953 F.2d 724, 728 (1st Cir. 1992) (finding "a rip-off, a fraud, a scandal, a snake-oil job" to be figurative and hyperbolic, and thus, protected opinion); *Rizzuto v. Nexxus Prods.*, 641 F. Supp. 473, 481 (S.D.N.Y. 1986) (finding defendant's statements about "lying salesperson" and "rip you off" to be expressions of opinion); *Beilenson v. Superior Court*, 44 Cal. App. 4th 944, 951 (1996) (finding opinion that plaintiff's conduct was a "rip-off" to be rhetorical hyperbole).

surrender charge question "ha[d] a simple answer," but the agent instead "g[ave] an answer that's muddled with information about taxes and IRAs." *Id.* at 12. After viewing the agent's answer, Attorney General Swanson commented that the salesman's answer was "absolutely misleading" because he did not sufficiently explain surrender penalties and the "tax issue ha[d] nothing to do with what [the senior] [was] asking." *Id.*[60]

Seminar. At the seminar, Mr. Clark—like the agent depicted in the episode—also deflected criticisms of surrender charges to focus on tax deferment.

Mr. Clark told attendees he would teach them the "language of annuities" to use with potential clients. Recording Tr. Day 1 at 24-25.[61] When addressing a list of annuity criticisms, he began with surrender charges. *Id.* at 186. He acknowledged "[t]here are some high surrender charges," but then quickly shifted to explain that he

---

[60] Attorney General Swanson commented that "people deserve clear explanations," stating "[i]t's absolutely misleading. I mean, really, they need to deal with these seniors straight." *Dateline* Tr. at 14. In response to Mr. Hansen's statement that the salesman showed the senior a brochure and a "sliding scale of what the penalties would be," Attorney General Swanson stated "Yeah, he kind of he [sic] did. But it was pretty quick. . . . And then the whole time he's talking tax talk. The tax issue has nothing to do with what she's asking." *Id.*

[61] Mr. Clark said: "[E]ven if you've been in the business for a long time . . . I want you to approach this like you're learning a new language. . . . So approach— I'm going to teach you the language of annuities." Recording Tr. Day 1 at 24-25.

Then, after giving attendees language to use in their sales presentations, he said: "And I've already given you a sales presentation, the magic genie, and I have given you some fantastic power phrases. I've given you a lot of power phrases." *Id.* at 173. He stressed that another seminar attendee had "bec[o]me a millionaire from what he learned that I gave him." *Id.* at 174.

liked surrender charges because they "enable[] higher rate[s] of return" and they serve as "an incentive to take advantage of tax deferments." *Id.* at 178, 186. He said:

> [T]he other reason I like the surrender charge is as a deterrent against competitors. The reason I like the surrender charge, it encourages the client to keep their money there for—for tax deferment compounding growth. Okay? That's how I look at surrender charges.

*Id.* at 178.[62]

Comparison. The salesman's approach in the *Dateline* episode resembled Mr. Clark's at the seminar. Mr. Clark and the salesman both deflected attention away from surrender charges by redirecting the conversation toward tax deferment benefits. Attorney General Swanson's comment was consistent with the episode's suggestion that the Annuity University graduate misled the senior by not directly answering the senior's surrender charge question.[63] *Dateline* Tr. at 11-12. The seminar recording shows that this portion of the "mislead seniors" gist was not materially false.

------

[62] *See also* Recording Tr. Day 1 at 177-78 ("And if a competitor wants the money, well, that's why I like a surrender charges [sic]. See, a surrender charge is an incentive to take advantage of tax deferment.").

[63] Mr. Hansen commented on the graduate agent's response to the senior's surrender charge question. He said: "[W]ill [the agent] be honest and make sure [the senior] understands the size of those surrender penalties? . . . . [The senior] is asking about taking her money out in an emergency. It's a simple question really. And it has a simple answer. He could say: 'Yes ma'am, it's costly to take money out early. You'd lose a bundle.' But instead of saying that, [the agent] gives an answer that's muddled with information about taxes and IRAs." *Dateline* Tr. at 11-12.

### 3) Attorney General Swanson's liquidity comment[64]

Episode.  Asked to "characterize" Mr. Clark's statement from the seminar that annuities provide "more choices to access your money . . . than any other financial instrument," Attorney General Swanson said:  "I think that he is not telling the truth when he tells those agents that an annuity is the most liquid place a senior citizen can put their money.  It is simply not true." *Id.* at 9; Recording Tr. Day 1 at 72.[65]  Her comment goes to the "mislead seniors" part of the episode's gist.

The episode had already reported that "some experts" said annuities are a "horrible investment for many seniors" because they can "lock up most of [the senior's] money for more than a decade," and that "if [the senior] needed to withdraw his cash early, he would pay stiff surrender penalties." *Dateline* Tr. at 1.  The episode also previously said that Mr. Clark taught agents to "[p]romise people easy access to their money" to close the annuity sale.  *Id.* at 9.  Attorney General Swanson's comment was consistent with these statements about liquidity.

Seminar.  Mr. Clark and other Annuity University speakers acknowledged at the seminar that annuities have surrender charges that impede the annuity holders'

---

[64] Liquid, in this context, means "[e]xisting as or readily convertible into cash." *Liquid*, American Heritage Dictionary (5th ed. 2011).

[65] The episode showed Mr. Clark's statement:  "There are more ways to access your money.  There are more options.  There are more choices to access your money from an annuity than any other financial instrument."  Mr. Hansen narrated:  "We asked Minnesota Attorney General Lori Swanson to watch what our hidden cameras had captured." *Id.* at 11.  Mr. Hansen then asked Attorney General Swanson:  "How would you characterize what this man has said?" *Id.*

ability to access their money.  It follows that annuities cannot be the most liquid option available to seniors.  Mr. Clark even told the agents:  "There are some high surrender charges . . . .  You don't put your money in to take it out, put it in, take it out."  Recording Tr. Day 1 at 186.  Annuity University speakers Josh Geisemann and Mr. Duff similarly acknowledged that surrender charges existed on annuity products.  *Id.* at 124-25, 128-29 (Mr. Geisemann); Recording Tr. Day 2 at 6 (Mr. Duff).  Mr. Clark also thought surrender penalties were beneficial for asset preservation.  Recording Tr. Day 1 at 186 ("Surrender charges enables [sic] higher rate of return.  It deters people trying to take the money from the client.").  He therefore contradicted his own statement about "choices to access your money" with other comments he made at the seminar.

Mr. Clark identified ways to "eliminate the impact" of surrender charges, such as giving clients a bonus on the rate of interest they receive from the annuity to offset the amount of the surrender charge,[66] or including surrender charge waivers for hospital emergencies, or allowing a 10 percent withdrawal option without penalty.

---

[66] *See, e.g.*, Recording Tr. Day 1 at 186-87 ("But [the surrender charge] does decline, it disappears, and I can—I can eliminate the impact of a surrender charge by virtue of adding the bonus.  If I add an interest bonus on the first year, I just eliminated the impact of the surrender charge."); *id.* at 179 ("[N]ow, let's say that you have an annuity that has a 10 percent surrender charge.  What if the insurance company credits 10 percent bonus in the first year?  You just, in effect, shaved off the 10 percent penalty by virtue of the bonus.  So people don't understand surrender charges.  Oh, they got big surrender charges[?]  Not necessarily so. I can eliminate the impact of the surrender charge by adding a bonus on the front end.").

*Id.* at 177-79.[67]  Mr. Clark acknowledged that "[n]ot all annuities have all these

features but many of the top good annuities have most of these options."  *Id.* at 175.

Other seminar speakers explained that these features were more limited than Mr.

Clark suggested and would not necessarily allow seniors ready access to their full

investment.[68]

Comparison.  With Mr. Clark and the other seminar speakers sending mixed

messages about annuity liquidity at the seminar, Attorney General Swanson's

statement compared to the seminar did not make the "mislead seniors" part of the gist

materially false.  It went no further than the episode's earlier characterization about

the liquidity of annuities and was consistent with statements at the seminar by Mr.

Clark and other Annuity University speakers acknowledging impediments to seniors'

ability to access their money.  The episode also acknowledged the surrender penalty

---

[67] *See, e.g.*, *id.* at 177 ("Now, when—when will seniors need their money?  If they had an emergency such as a hospital, nursing home, well, you get all your money with no penalty.  If you just want some of your money, you've got 10 percent withdrawal.  If my clients do need the money, they have a hospital, nursing home waiver, no penalty; they have 10 percent withdrawal, no penalty.").

[68] For example, one seminar speaker explained that the clients' option to withdraw 10 percent of their invested money without a surrender charge begins only in the second year of the annuity, and that one type of waiver allows clients to withdraw 75 percent of their money without charges.  *Id.* at 112-13; *see also* Supp. App. at 828 (explaining that most companies "only allow the nursing home [waiver] to be available starting in the second year").  The speaker also explained that clients may still have to pay taxes on their withdrawal, even if they did not incur a surrender charge.  Recording Tr. Day 1 at 113.  Another speaker explained that bonuses used to offset the effect of surrender charges often accompany longer-term annuities, *see* Recording Tr. Day 2 at 215-18, and may not offset the surrender charge enough for seniors to withdraw the full amount at any time.  *Id.* at 125, 128-30.

mitigation options Mr. Clark discussed at the seminar, stating that "with some exceptions, annuities lock up most of your money for a specified number of years." *Dateline* episode at 9. Attorney General Swanson's comment, therefore, did not cause the episode to have "a different effect on the mind of the [viewer] from that which the pleaded truth [of the seminar recording] would have produced." *Air Wisc. Airlines*, 134 S. Ct. at 861 (quoting *Masson*, 501 U.S. at 517). Even if the comment caused some "comparative harm" to BCA's reputation compared to the seminar, it was "modest" at best. *Bustos*, 646 F.3d at 765. It did not make the "mislead seniors" part of the gist materially false under the *Masson/Bustos* standard.

ii.      BCA's arguments

BCA makes several arguments about the "mislead seniors" part of the gist.

First, regarding inflated credentials, BCA alleged that the "Alligator book" mentioned in the episode "is not ghost-written or misleading to readers in any way whatsoever" because one chapter is "actually authored by the insurance agent . . . and is clearly identified as such," and "[t]he rest of the book's chapters" are "clearly identified as written by a named qualified expert." Am. Compl. at 39-40, ¶ 111. The seminar does not support this allegation because Mr. Hoyle said nothing about the "Alligator book" beyond offering it to attendees as a "coauthored book." Recording Tr. Day 2 at 54.

More important, this allegation, assuming it is true,[69] may survive the material falsity analysis standing alone,[70] but in the context of the episode and the seminar, its technical inaccuracy does not overcome the menu of credential-inflating marketing opportunities presented to attendees at Annuity University. When considered along with Mr. Hoyle's urging the agents to pay for placement of pre-packaged radio interviews and ghost-written articles and Mr. Duff's book possibility that overstates the agent's contribution,[71] the episode's statement that agents "pretended to be authors" of the "Alligator book," even if inaccurate, did not render the "mislead seniors" gist materially false under the *Masson/Bustos* standard.

The seminar's smorgasbord of questionable marketing opportunities undercuts BCA's allegation that "[n]othing taught by Clark, and none of the products sold at Annuity University, are intended to deceive, or in fact deceive, seniors into believing that books not written by agents were written by agents." Am. Compl. at 40, ¶ 114. The premise of the prescripted radio show, the ghost-written articles, and the co-

---

[69] *See Mayfield v. Bethards*, 826 F.3d 1252, 1255 (10th Cir. 2016) ("In reviewing a motion to dismiss, we accept the facts alleged in the complaint as true and view them in the light most favorable to the plaintiff.").

[70] But it may not survive because BCA alleged the book is not misleading "in any way whatsoever." Am. Compl. at 40, ¶ 111. Placing an agent's name and photo on the book cover implies the agent had a more substantial role in creating the book than just preparing the first chapter.

[71] At the seminar, Mr. Hoyle referred briefly to the "Alligator Book." *See* Recording Tr. Day 2 at 54. Mr. Duff talked about other books. *See* Recording Tr. with Presenter at 2-4.

authored books is the same:  agents were taught to pay for marketing opportunities

that inflate their credentials and then to leverage the appearance of expertise to gain

credibility with prospective clients.

Second, BCA argues, without citation to the seminar, Aplt. Br. at 33 (citing

Mr. Clark's declaration), that Mr. Clark reminded agents to use ethical sales practices

and that they had independent ethical obligations as licensed insurance agents.  *Id.*[72]

Mr. Clark mentioned ethics in the context of teaching agents to use their professional

standards to build their sales confidence.  He said:

> You're bringing a priceless value to the table.  You're bringing your honesty, and you bring in your ethics, and you bring in your trust, and you bring in your care about your client.  You can't put a price on that.

Recording Tr. Day 1 at 38.

During the seminar, Mr. Hoyle also cited the National Ethics Bureau as a

marketing tool:

> Does anybody know what the National Ethics Bureau is?  Members?  Are you members?  For those of who you [sic] are not, I really encourage you to consider this strongly . . . .  [T]hey basically do, you know, an extensive background check for you and provide you with clearance to be a member of the National Ethics Bureau.  What that means is you get the use of the

---

[72] The relevance of BCA's argument is unclear.  To the extent BCA argues Mr. Clark taught agents to use ethical sales practices in a way that would negate the "mislead seniors" part of the gist, we are unpersuaded.

The *Dateline* episode acknowledged BCA's ethics arguments.  It quoted BCA's response letter, stating BCA's position that Mr. Clark "teaches agents to be 'honest, ethical, and service-oriented'" and that insurance agents have a duty to "'present the facts, both pleasant and unpleasant, to customers."  *Dateline* Tr. at 18. *See Biro v. Conde Nast*, 883 F. Supp. 2d 441, 483 (S.D.N.Y. 2012) (finding significant that allegedly false and defamatory article "include[d] [plaintiff's] responses to many of the accusations reported in the Article").

National Ethics Bureau logo—they have customizable brochures that you can use as well—and the National Ethics Bureau profile [which agents can direct clients to]. . . . This is another added layer of credibility. . . . It also gives you a plaque of the same thing that you can use in your office as well.

Recording Tr. Day 2 at 76-77.

These two mentions of ethics were made to advance the seminar's purpose of teaching agents how to sell annuities and get rich. They do not change the fact that Annuity University taught agents to mislead seniors.

iii.    Conclusion

The seminar recording showed Annuity University taught attendees to mislead seniors by purchasing ghost-written materials and prescripted radio shows to boost their credibility. It also taught them to avoid answering questions about surrender charges by following Mr. Clark's example. Attorney General Swanson's comments were consistent with the "mislead seniors" portion of the gist and did not render the episode materially false compared to the seminar. The seminar's passing references to ethics did not alter these conclusions. The "mislead seniors" gist of the episode was not materially false.

c.    *"Unsuitable insurance products"*

The *Brokers' Choice II* panel described the gist of the *Dateline* episode by stating that Mr. Clark taught agents to "scare and mislead seniors into buying unsuitable insurance products." 757 F.3d at 1138. We focus here on the "unsuitable products" part of the gist, again keeping in mind it is closely related to the other parts. This is so because offering a seminar on how to sell annuities and instructing the agents

on how to scare and mislead seniors into buying them means that at least some of the resulting sales are likely to be unsuitable for certain seniors. Moreover, because the seminar provided little guidance to the agents on how to assess whether an annuity is suitable or unsuitable for individual seniors and instead emphasized hard-sell tactics generally, it also follows that some resulting sales are not likely to be suitable.

        i.        <u>The episode and the seminar</u>

<u>Episode</u>. The episode reported that annuities are "legitimate investment[s] for some people,"[73] but that experts say they are "a horrible investment for many seniors." *Dateline* Tr. at 1. It pointed to two key features that can render the product unsuitable: (1) annuities lock up the invested money for "longer than [the senior] might live"; and (2) a senior who needs to withdraw the money early must pay "stiff surrender penalties." *Id*.

<u>Seminar</u>. In its amended complaint, BCA alleged the seminar showed Mr. Clark teaching the downsides of annuities as a way to determine if they were suitable for the client, Am. Compl. at 8, ¶ 27, urging attendees to learn the customer's

_____

[73] The seminar recording shows Mr. Clark personally believes in annuities based on his clients' success with the products, *see, e.g.*, Recording Tr. Day 1 at 2, 32-33, 39, and it reveals his belief that annuities are superior products for seniors, *id.* at 11, because they are more stable than other products, *id.* at 80. For him, no other product offers similar advantages. *Id.* at 10.

    The *Dateline* episode reported Mr. Clark's belief in annuities and never stated that annuities are unsuitable for everyone. It began by noting that annuities are a "legitimate investment for some people." *Dateline* Tr. at 1. Just before the Annuity University segment began, the episode again stated that "Annuities are legitimate investments for some people, and Clark is a strong advocate for them." *Id.* at 8. The episode therefore acknowledged the legitimacy of annuities for some and Mr. Clark's belief in them, accurately conveying those points from the seminar.

personal situation to determine the most suitable product, *id.* at 8, ¶ 26, and "repeatedly stress[ing]" annuities are not for everyone, *id.* at 33, ¶ 98; *id.* at 37, ¶ 108. On appeal, BCA similarly argues that Mr. Clark "stresse[d] the need to determine whether a particular annuity is a suitable product for a prospective client." *Id.* at 7 ¶ 25; *see also* Aplt. Br. at 32-34.

The seminar recording largely negates BCA's assertions. As previously discussed, a main purpose of the seminar was to teach agents to sell annuities and to get rich doing so. The seminar recording shows that Mr. Clark hardly addressed how to determine if an annuity is suitable for a particular client, minimized the two unsuitability concerns mentioned in the episode, and summarily discussed disadvantages of annuities. The seminar's emphasis on selling annuities to become wealthy and its dearth of instruction on how to determine whether annuity products are suitable for particular seniors make the "unsuitable products" part of the gist not materially false.

The seminar contained only minimal discussion of the suitability of annuities for potential clients generally and little meaningful discussion about suitability for a particular client. Mr. Clark addressed "suitability" on the first day of Annuity University when describing the power of emotional appeals. But rather than discuss when an annuity is a good fit for a client, he shifted to the client's desire for the product, which the agent was encouraged to cultivate based on the sales tactics. Recording Tr. Day 1 at 155-56. Mr. Clark said there are "issues today within our business about suitability" because "regulators refuse to define 'suitability[.]'  And

the insurance companies are trying to get a handle on it. They don't know how." *Id.* at 156. Instead of explaining what these statements were supposed to mean, he said he based "suitability" on whether the client ultimately chooses to purchase the annuity:

> I say, look, you know when you take all the benefits of annuities, all the things I'm talking about, but if a person buys an annuity for just . . . one benefit, is it suitable? Well, gosh, I guess it is.

*Id.* He continued:

> Now, let me define "suitability." If the consumer feels after giving all the information about a product, what it does, what it doesn't do, how it works, doesn't work, and they want the product, it is suitable. It is suitable.

*Id.* Mr. Clark then moved on to quiz the attendees on the six benefits of an annuity, but mentioned no objective criteria to determine suitability or factors to guide the agent's advice to a particular client. *Id.*

Mr. Clark's notion of suitability turned on the customer's preference. His message was that an annuity is suitable if the customer buys it, a message that aligns with a main purpose of the seminar.

Comparison. The episode explained annuities could be unsuitable for two related reasons: (1) annuities "lock up" the senior's money; and (2) seniors seeking to withdraw money early pay "stiff surrender penalties." *Dateline* Tr. at 1. As described in the "mislead seniors" gist analysis above, Mr. Clark and other seminar speakers recognized that—despite mitigation options—high surrender penalties could prevent seniors from readily accessing their full investment. Recording Tr. Day 1 at

- 73 -

186 ("There are some high surrender charges . . . . You don't put your money in to take it out, put it in, take it out.").

The seminar's limited discussion of suitability, lack of meaningful instruction on how to determine whether an annuity is suitable for a particular client, equating suitability to customer desire, and teaching scary and misleading pitches to help agents sell annuities and get rich—together show that Mr. Clark did not stress the need or how to determine whether an annuity is suitable for a particular client.

The episode's "unsuitable products" gist was not materially false.

ii.   BCA's arguments

None of BCA's arguments demonstrate that Mr. Clark taught agents to make an individualized suitability inquiry or otherwise show the episode's "unsuitable products" gist was materially false.

1)   Addressing annuity criticisms

BCA alleged Mr. Clark taught attendees about the suitability of annuities for prospective clients by discussing annuity criticisms. Am. Compl. at 8, ¶ 27; Aplt. Br. at 33. But Mr. Clark's discussion of criticisms was perfunctory and did not address when an annuity is suitable for a particular client.

BCA points out that Mr. Clark told attendees he would "tear apart" annuities, Aplt. Br. at 33, but he did not do so to address suitability. He began the seminar by saying:

> So, you know, I—of course, I'm going to show you guys how to sell annuities. I'm going to tear them apart, and I'm going to tear them to

the bare bones and then build them back up so you really understand the good and bad of the products and everything going on.

Recording Tr. Day 1 at 4; *see also* Aplt. Br. at 33. But his purpose in "tear[ing] them" down was to "build them back up" and show attendees how to counter annuity criticisms. This exercise, however, did not to instruct agents about suitability. Mr. Clark's discussion of specific criticisms then focused on either discrediting[74] or explaining each criticism away[75] to complete the sale.[76] *See id.* at 186-95; *see also*

---

[74] Mr. Clark said: "What's wrong with annuities? Surrender charges; they've got low renewal rates; they're taxed on death; if you take money out, it's taxed as ordinary income versus just a capital gain tax which is a lot less; there is no step-up basis on death; they're not FDIC insured; they're not dramatic and jazzy; they're issued by the insurance company. You know, an insurance company cannot come out with a good product, can they? You know, how dare they . . . . If there is a criticism of annuities, this is it. This is the laundry list of annuities, negative laundry list." Recording Tr. Day 1 at 185-86. *See also id.* at 195-96 (concluding discussion of criticisms saying: "Now, the point I'm making, folks, is this. Here's the bad that I covered, and then I gave you the good. Remember the 18 pillars of annuities? Take those in combination. . . . [T]ake a look at our targeted market . . . . [T]ake those two things in perspective. . . . Then take all the other financial products there is [sic], and then take the criteria. Nothing can stack up to the safety, the liquidity, the tax advantages, the returns without risk, the probate avoidance and the nursing home protection. . . . So if this—this is the best product for our market, then why aren't you selling more?").

[75] Mr. Clark explained away annuity criticisms. *See, e.g.*, *id.* at 187 (stating "I don't think that that's a valid criticism" regarding surrender charges because, "[i]n the real world, [seniors] never touch their money [in annuities]"); *id.* at 72 (stating "Annuities are not liquid. That is baloney, that's garbage, that is not true."); *id.* at 189 ("Taxable upon death, that's valid, but you can get a tax beneficiary rider, you can take the 10 percent out a year."); *id.* at 190 ("Taxes, income taxes versus capital gains tax. That's a valid criticism. But the thing is they don't touch their money. They never take their money out.").
Other speakers similarly explained away surrender charge criticisms as unimportant to senior clients. *See* Recording Tr. Day 2 at 6 (echoing Mr. Clark and stating, "[a]ll this to-do about surrender charges when nobody takes any money out of an

Continued . . .

*Brokers' Choice III*, 138 F. Supp. 3d at 1209-11 (summarizing criticisms invalidated by Mr. Clark).

Mr. Clark's summary discussion of annuity criticisms did not teach attendees about the suitability of an annuity for a particular client. Rather, the seminar generally stressed the positive aspects of annuities, which attendees memorized and recited back to Mr. Clark,[77] and endeavored to convince attendees of Mr. Clark's belief that annuities are the best product for seniors. He told attendees he would teach them the "language of annuities," Recording Tr. Day 1 at 24-25, effectively encouraging them to mirror his approach. The seminar's inclusion of annuity criticisms did not make the episode's gist about "unsuitable products" materially false.

___

annuity. They're afraid to. It might blow up or something, I don't know."); *id.* at 210 (echoing Mr. Clark and stating, "I mean, even when you—when you sit back and you think about it, how much money is—I mean, what is it, almost 90 percent of—88 percent of annuities are never touched? I mean, think about it, 88 percent of annuities are never touched.").

[76] *See, e.g.*, Recording Tr. Day 1 at 11 ("Just so you understand, you need to expect, expect that your competition does not understand the products and they're going to bad-mouth annuities. Expect that."); *id.* at 184-85 ("There is a zillion—zillion objections [that may come from a client], but is the client selling you and you're buying it? Who's selling who? Are you selling the client, or is the client selling you? . . . So when you know the [facts about the six features of an annuity], then who is selling who?").

[77] Mr. Clark said: "And an annuity—there's six features—remember when I said I want you to understand the language? I want you to memorize the six features of an annuity: safety, liquidity, tax advantages, competitive returns without risk, probate avoidance, and you can still structure the annuity to protect the asset from a nursing home spend-down. Nursing home benefits." *Id.* at 65; *see also id.* at 156-57 (repeating six benefits to Mr. Clark).

2) Suitability references

BCA's brief posits three instances over the seminar's two days when Mr. Clark purportedly acknowledged an annuity may not be suitable. *See* Aplt. Br. at 31-33. But merely alluding to suitability does not show that Mr. Clark taught attendees how to make an individualized assessment. Indeed, each example demonstrates how little Mr. Clark dealt with suitability, not how much.

First: "If you're going to put your money in and take it out, put it in and take it out, an annuity is not for you." Recording Tr. Day 1 at 178; Aplt. Br. at 33. But Mr. Clark said this while telling attendees how to defeat surrender charge criticisms and close the sale. Recording Tr. Day 1 at 177-78. He then quickly dismissed the relevance of his own statement: "In the real world, they never touch their money. Seniors put their money in annuities, I'm sorry, but they never touch it. They never take it out." *Id.* at 187.

Second:

> They're only interested in, number one, is my money safe; number two, can I get it if I need it; and number three, will I get a fair return. They don't want—oh, I want the highest returns, I want the S&P, and I want this and that. Maybe if you have somebody like that, you've got the wrong client. You've got the wrong client.

*Id.* at 76; Aplt. Br. at 33. Mr. Clark made this statement in the context of teaching attendees how to use scare tactics and emotional appeals at sales seminars with prospective clients and how to use the right messaging to close the sale, not to teach them how to learn about an individual client's needs and priorities. According to Mr. Clark, a client would be "wrong" for an annuity by wanting "the highest returns . . .

the S&P, and . . . this and that."  Recording Tr. Day 1 at 76.  BCA's reliance on this

statement from Mr. Clark to show that he instructed seminar attendees on how to

determine whether an annuity is suitable for a particular senior is not convincing.

Third, selling to a prospective client requires knowledge of:

[W]here their money is at right now—where their money is at—okay?—is that good for the client?  Should they keep it?  How do you articulate that to them?  They don't even know what they got to begin with. . . .  You're not selling smoke and mirrors. You're not selling garbage.

Recording Tr. Day 1 at 13; Aplt. Br. at 31.[78]  Mr. Clark's question of whether a

customer's money is in a place that is "good for the client" referred to how agents

should "articulate" the "selling" of annuities to close a sale.  Recording Tr. Day 1 at

12-14.  It did not address whether an annuity is suitable for a particular client.

### 3) Teaching to preserve assets

BCA argues Mr. Clark taught agents to "preserve client assets."  Aplt. Br. at

32.  But even if that is so, he did not teach agents when or how asset preservation—

as opposed to other individual financial goals—would fit a particular client's needs.

Instead, he discussed asset "preservation" as a key sales message:

But, see—by the way, when it comes to indexed annuities, what I tell agents, don't sell these products based on the performance.  Play down the performance.  Okay?  Play down the performance.  Sell the products.  Remember, our first objective is preservation.  Performance comes secondary.  Okay?

---

[78] BCA cited this passage in support of its argument that Mr. Clark "stressed 'truth and facts' in making sales."  Aplt. Br. at 30.  We analyze the passage here to the extent it is relevant to the "unsuitable products" portion of the gist.

Recording Tr. Day 1 at 189.[79]  Although preserving assets may be a positive objective for many seniors, it may not be the proper goal for others, like a senior who needs flexibility to access invested money.  Again, Mr. Clark instructed agents on how to make an effective sales pitch without any individualized inquiry into the client's personal priorities or the suitability of the annuity for the client.  It follows that this undifferentiated pitch will promote an unsuitable product for some seniors.

### iii.  Conclusion

The seminar recording shows Mr. Clark did little to instruct agents on how to determine the suitability of an annuity for the individual prospective client or urge them to do so.  His summary discussion of annuity criticisms and passing references to suitability pale in comparison to his advocacy of making the sale to seniors.  Compared to the hard-sell purpose of the seminar and the tactics taught to scare and mislead seniors, the suitability of annuities received short shrift.  The episode could have been more balanced on this point, but it was not materially false.  *See Corp. Training Unlimited, Inc.*, 981 F. Supp. at 122 (declining to hold media defendant

---

[79] Mr. Clark also taught attendees to win sales based on his experience that asset preservation is the client's primary objective, without instruction on how to evaluate a client's personal priorities or determine the suitability of an annuity for those priorities.  *See* Recording Tr. Day 1 at 34-35 ("When you have people trying to take your sale away, when you have somebody trying to criticize what you do—if that happens, here's the key:  When it comes to my clientele, the people that I work with, preservation must precede performance.  So my client's first and foremost chief objective is to preserve what they have.  Their second objective, maybe, is returns.  So when it comes to those clients, this is the number-one product.  And that's what I'm trying to say.").

liable for truthful statements where additional facts "might have cast plaintiff in a more favorable or balanced light"); *see also Machleder*, 801 F.2d at 55 (same).

*   *   *   *

**EPISODE GIST WAS NOT MATERIALLY FALSE**

We agree with the district court that, when compared with the full seminar, the gist of the episode was not materially false. The episode was not "likely to cause reasonable people to think 'significantly less favorably'" of BCA than if they had viewed the seminar recording in its entirety. *Bustos*, 646 F.3d at 765.

3. **Analysis of *Dateline* Episode Statements**

The foregoing gist analysis compared the episode's overall message, as identified in *Brokers' Choice II*, with the entire seminar. BCA's amended complaint also alleged that 12 statements in the episode were false and defamatory. Many of them overlap with and contribute to the gist of the episode, and we have addressed those statements in our analysis of the gist. Nonetheless, to the extent any fall outside the gist or otherwise deserve separate analysis, we consider them below.

We do so understanding they must be viewed "in the context of the whole [episode]," *Rinsley*, 700 F.2d at 1310, and compare them with the full context of the seminar. This is consistent with cases in which courts have addressed the alleged false and defamatory publication taken as a whole and also addressed particular statements in the publication alleged to be false and defamatory. *See, e.g.*, *Green v. CBS, Inc.*, 286 F.3d 281, 284-85 (5th Cir. 2002) (analyzing individual statements and gist of broadcast as a whole to determine that broadcast, taken as a whole, was

- 80 -

substantially true); *Chapin*, 993 F.2d at 1098 ("Notwithstanding the non-actionability, in isolation, of the various statements we discussed [earlier in the opinion], we would err if we did not consider the article as a whole."); *Klentzman v. Brady*, 456 S.W.3d 239, 256 (Tex. App. 2014) (explaining that plaintiff challenged both the falsity of individual statements and the gist created by omission of key facts).

Although BCA does not contest the accuracy of the words the episode quotes from the seminar, it argues the statements about BCA in the *Dateline* episode conveyed a materially false depiction of the seminar. We compare the statements with the full context of the seminar and conclude that they are not materially false.

a. *Statement 1*[80]

Mr. Hansen introduced the episode as follows:

*Join us in a ground-breaking hidden-camera investigation, as we go behind the scenes to uncover the techniques they use: inside sales meetings—where we catch the questionable pitches; inside training sessions—where we discover agents being taught to scare seniors; and finally, inside seniors' homes to reveal the tricks some agents use to puff their credentials to make a sale.*

*Dateline* Tr. at 2; Am. Compl. at 25, ¶ 73.[81]  BCA alleged this statement is materially false because Mr. Clark did not teach scare tactics; he addressed "a legitimate and

---

[80] We address the episode statements in the same order they appear in BCA's amended complaint and conclude with BCA's alleged description of an episode preview aired on *The Today Show*.

[81] After Mr. Hansen stated that *Dateline* discovered "agents being taught to scare seniors," the introductory narration paused and the episode interjected a short

Continued . . .

important aspect of financial management for seniors" and instructed agents to "identify potentially frightening or disturbing issues which must be addressed in determining the suitability of insurance products." Am. Compl. at 25-26, ¶ 75.

As outlined above in our "scare seniors" and "unsuitable products" gist analysis, the seminar recording belies BCA's allegations and shows that Mr. Clark taught scare tactics to sell annuities without significant inquiry into the product's suitability for a prospective senior client.

Statement 1 was not materially false.

b. *Statements 2 and 3*

After the introduction, the episode addressed agents' tactics in sales meetings by showing video of interactions with elderly customers. BCA alleged the episode depicted agents "attempting to trick and deceive senior citizens into purchasing unsuitable insurance products with their retirement savings." Am. Compl. at 26, ¶ 77. This segment does not mention BCA. *Dateline* Tr. at 2-7.

Mr. Hansen then transitioned to Annuity University:

*We've seen some of the tactics insurance agents use to sell seniors. The agents seem awfully slick. How did they get so good? You are about to witness something few people have ever seen—a school where, authorities say, insurance salesmen are being taught questionable tools of the trade.*

*These training sessions are only open to licensed insurance agents. We don't know whether these salesmen we've met so far studied here, but the State of Alabama agreed to help us investigate by issuing insurance*

clip of Mr. Clark from the seminar telling attendees: "[S]ee, that's scary and it should be scary." *Dateline* episode at 4:55-5:05; Am. Compl. at 25, ¶ 74.

*licenses to two Dateline producers, so we could attend—and bring along our hidden cameras.*

*Dateline* Tr. at 7; Am. Compl. at 26-27, ¶¶ 78-79. Construing BCA's complaint liberally, we think BCA attempted to allege the episode omitted "details of the collusion" between Alabama and *Dateline*. Am. Compl. at 27, ¶ 79. But the alleged falsity of this statement does not concern BCA, and is thus not materially false as to BCA. *Bustos*, 646 F.3d at 765 ("[T]he alleged misstatement must be likely to cause reasonable people to think 'significantly less favorably' *about the plaintiff . . . .*" (emphasis added)).

Statements 2 and 3 were not materially false.

c. *Statement 4*

Following Statements 2 and 3, the *Dateline* episode immediately cut to hidden camera footage from Annuity University of Mr. Clark speaking, followed by Mr. Hansen's voiceover:

(Hidden Camera). *Mr. Clark: Annuities are not liquid? That is baloney.*

*Mr. Hansen: This is the man in charge of 'Annuity University'—Tyrone Clark, the self-proclaimed king of annuity sales. Annuities are legitimate investments for some people, and Clark is a strong advocate for them. He says they're safe and have no risk,*[82] *selling points especially appealing to seniors.*

*Mr. Clark: What I sell in* [sic] *peace of mind . . . .*

---

[82] The episode superimposed the words "No Risk" as Mr. Hansen said them. *Dateline* episode at 29:30-29:34.

- 83 -

*Dateline* Tr. at 7-8; Am. Compl. at 27, ¶ 80. The amended complaint alleged that the excerpt showed:

- Mr. Clark "teaches agents deceptive sales practices, based on scaring seniors, and that the agent can then sell back the 'peace of mind' taken away during the scary and deceptive sales pitch, by selling unsuitable annuity products." Am. Compl. at 27-28, ¶ 82.

- In context, "peace of mind" refers to the fact that annuities are not subject to loss from market volatility. *Id.* at 28, ¶ 85.

- Contrary to Mr. Hansen's assertion, Mr. Clark never said annuities "have no risk." *Id.* at 27, ¶ 81.

Nothing in this statement from the episode refers to scaring seniors. BCA's description of what this statement nonetheless conveyed closely resembles the "scare seniors" gist of the episode, which we have addressed at length above. Mr. Clark taught agents to uncover a senior's emotionally based problem and then solve it by selling the senior an annuity.

Moreover, the seminar recording contradicts BCA's assertion that Mr. Clark never said annuities "have no risk." Am. Compl. at 27, ¶ 81. He stated several times that a key feature of an annuity is that it offers "[c]ompetitive returns without risk. Without risk." Recording Tr. Day 1 at 66; *id.* at 156 (reiterating that one of the six features of an annuity is that it is "[w]ithout risk"); *see also Brokers' Choice III*, 138 F. Supp. 3d at 1206 n.8 (compiling Mr. Clark's statements that annuities offer no risk).

Statement 4 was not materially false.

- 84 -

d. *Statement 5*

Following Statement 4, Mr. Hansen stated:

> *But what else is Tyrone Clark teaching? In 2002, the State of Massachusetts accused Clark and his companies of a "dishonest scheme to deceive, coerce and frighten the elderly."[83] Part of the evidence was the training manual in which Clark tells agents to sell to seniors by assuming they're selling to a "12-year-old" and by hitting their "fear, anger or greed buttons."[84] Clark settled that case without admitting any wrongdoing. And, now, his company says it's become an industry leader in promoting ethical conduct. But watch what our hidden cameras found, and see if you agree. Remember those scare tactics?[85]*

*Dateline* Tr. at 8; Am. Compl. at 29, ¶¶ 86-87. BCA alleged that Mr. Hansen left out that Massachusetts never proved any of its allegations against Mr. Clark and that the settlement terminated the state's claim. Am. Compl. at 29, ¶ 87. But the episode stated that the Massachusetts case was settled "without admitting any wrongdoing," contradicting BCA's allegations. *Dateline* Tr. at 8; Am. Compl. at 29, ¶¶ 86-87. *See Machleder*, 801 F.2d at 55 (declining to hold media defendant liable for truthful statements where additional facts would have cast plaintiff in a "more favorable" light).

Statement 5 was not materially false.

---

[83] The episode included an image of the complaint in the background and enlarged the words "dishonest scheme to deceive, coerce, and frighten the elderly . . ." as Mr. Hansen stated those words. *Id.* at 29:58-30:04.

[84] The episode included an image from the training manual in the background and enlarged the words "12-year-old" and "fear, anger or greed buttons" as Mr. Hansen stated those words. *Id.* at 30:10-30:17.

[85] The episode superimposed a label stating "Scare Tactics" when Mr. Hansen said those words. *Id.* at 30:30-30:32.

- 85 -

e. *Statement 6*

After he invited viewers to watch *Dateline*'s hidden camera footage, Mr.

Hansen concluded Statement 5 by asking: "Remember those scare tactics?" The

episode then cut to the seminar footage interspersed with Mr. Hansen's voiceover

commentary:

> (Hidden Camera). *Mr. Clark: And I'm bringing these things up that disturb the hell out of them.*
>
> *Mr. Hansen: For Tyrone Clark, disturbing people seems to be Annuity Sales 101.*
>
> (Hidden Camera). *Mr. Clark: I bring out the stuff that—where they can't sleep at night.*

*Dateline* Tr. at 8; Am. Compl. at 29, ¶ 88. BCA alleged that Mr. Clark never taught

agents to mislead seniors into purchasing annuities "by means of fabricated fears and

scare tactics." Am. Compl. at 30, ¶ 89. Instead, BCA alleged, Mr. Clark explained

to attendees "that a good agent brings value to his prospective clients by uncovering

issues that they will regard as important but have not considered, or that they have

considered but not realized the potential impact [of]" and that uncovering these issues

is the "only way to ensure a prospective client is considering suitable insurance

products." *Id.* at 31, ¶ 91.

As explained above in our "scare seniors" and "unsuitable products" gist

analysis, the seminar recording disproves BCA's allegations and shows that Mr.

Clark taught agents to use scare tactics to sell annuities without stressing that they

inquire into the product's suitability for a prospective senior client.

Statement 6 was not materially false.

f. *Statement 7*

Immediately following Statement 6, the episode presented the following voiceover and seminar excerpt:

> *Mr. Hansen: And how do you make them worry? One way is to suggest their money may not be safe, even in a bank, by telling a potential client something like this.*
>
> (Hidden Camera). *Mr. Clark: FDIC is insolvent.*[86] *FDIC only has $1.37 per every $100 on deposit.*

*Dateline* Tr. at 8; Am. Compl. at 31, ¶ 92. BCA alleged this statement meant that Mr. Clark taught agents to "make potential clients worry that their money may not be safe in banks." Am. Compl. at 31, ¶ 93. BCA further alleged that Mr. Clark never told attendees to represent that a customer's money may not be safe in a bank because he said a bank may be the proper place to keep funds in some situations. Am. Compl. at 32, 34 ¶¶ 94, 99. The seminar recording undercuts these allegations.

At the seminar, Mr. Clark reiterated that banks lack assets and reserves. He repeatedly asserted the superiority and stability of the life insurance industry over banks. For example:

> The banks don't have the reserves. No other institution does. Because the banks receive money, and they lend out 98 percent—excuse me— 90—92 percent. They'll lend the money out. People think you put money in the bank, it's sitting in the back room there, in the vault. It's not. Only a life insurance company is required to have the kind of reserves to back 100 percent of that money to insure that if that

---

[86] The episode superimposed a label of "Banking Fears" when Mr. Clark said "The FDIC is insolvent." *Id.* at 30:54-30:58.

individual contract owner or annuitant is going to take an income for the rest of their life that those reserves will guarantee and fulfill the income for the rest of their life.

Recording Tr. Day 1 at 50-51.[87]

Mr. Clark used this and other statements to bolster the superiority of annuities by implying that banks may be unsafe, or at least less safe than an annuity.

Statement 7 was not materially false.

g. *Statement 8*

Following Mr. Hansen's question, "And how do you make them worry?", from Statement 7, the episode included the following voiceover and seminar excerpt:

> *Mr. Hansen: Another way is to mention a senior's natural fear of nursing homes.*
>
> (Hidden Camera). *Mr. Clark: I help my clients to protect their life savings*[88] *from the nursing home and Medicaid seizure of their assets. See, that's scary, and it should be scary.*

---

[87] *See also* Recording Tr. Day 1 at 77-78 ("[T]he life insurance industry owns and controls more assets than all of the assets in all the banks in the entire world combined. . . . The life insurance industry bailed out the banking industry during the Great Depression."); *id.* at 83 ("See, during the Great Depression, the life insurance industry lent millions and millions of dollars to the banks who had no money. That's the strength and safety of our industry, and that's leadership.").

Mr. Clark also compared annuities with bank products: "Nothing can stack up to the safety, the liquidity, the tax advantages, the returns without risk, the probate avoidance and the nursing home protection [of an annuity.] Just take any—take a bank CD. It doesn't have all those." *Id.* at 196.

[88] The episode superimposed a label stating "Nursing Home Fears" when Mr. Clark said: "I help my clients to protect their life savings." *Dateline* episode at 31:07-31:10.

*Dateline* Tr. at 8; Am. Compl. at 34, ¶ 100.  BCA characterized this statement as saying Mr. Clark taught insurance agents "to prey on seniors' fears of nursing homes and that this is one of several ways [he] teaches agents to scare seniors into buying annuities."  Am. Compl. at 34-35, ¶ 101.  BCA alleged that, in context, Mr. Clark actually taught that the financial implications of nursing homes are an important part of effective financial planning for seniors.  *Id.* at 35, 36, ¶¶ 102, 104.

As explained in our "scare seniors" gist analysis above, Mr. Clark told attendees to use seniors' fear of asset seizure by nursing homes to sell annuities. Taken in context, Mr. Clark used his discussion of nursing homes to teach the agents an emotional appeal to make sales.

Although guest speakers at the seminar addressed financial planning by explaining Social Security taxation and Medicaid—which are related to nursing home planning—these sessions were structured to teach agents how to convince seniors to buy annuities as part of their financial planning.  *See* Recording Tr. Day 1 at 201. For example, Mr. Clark's nephew, Joe Clark, began his session stating:  "[O]ur discussion today, folks, is Medicaid planning with annuities."  *Id.* at 211.[89]

The seminar's financial planning instruction did not change that Mr. Clark also taught attendees to leverage seniors' fears of nursing homes to make sales.  Thus, the

_____

[89] Mr. Clark introduced these sessions as follows:  "But you need to understand Social Security taxation and Medicaid planning.  Okay?  You need to understand that stuff.  And Lance and Travis is [sic] going to cover this with you guys, and then Joe, my nephew . . . he's going to cover Medicaid planning with annuities."  Recording Tr. Day 1 at 201.

episode's omission of Annuity University's financial planning instruction was not

"likely to cause reasonable people to think 'significantly less favorably'" of BCA.

*Bustos*, 646 F.3d at 767; *see Corp. Training Unlimited, Inc.*, 981 F. Supp. at 122

(explaining that failure to "include additional facts which might have cast plaintiff in

a more favorable or balanced light" does not create liability where a media defendant

broadcasts truthful statements).

Statement 8 was not materially false.

h. *Statements 9 and 10*

Following Statement 8, the episode included the following voiceover and

seminar excerpt:

> *Mr. Hansen: The next step? Promise people easy access to their money. Even though, with some exceptions, annuities lock up most of your money for a specified number of years, listen to the sales pitch Tyrone Clark suggests.*
>
> (Hidden Camera). *Mr. Clark: There are more ways to access your money.*[90] *There are more options. There are more choices to access your money from an annuity than any other financial instrument.*
>
> *Mr. Hansen: We asked Minnesota Attorney General Lori Swanson to watch what our hidden cameras had captured.*
>
> *Mr. Hansen: How would you characterize what this man has said?*
>
> *Attorney General Swanson: I think that he is not telling the truth when he tells those agents that an annuity is the most liquid place a senior citizen can put their money. It is simply not true.*

---

[90] The episode superimposed a label stating "Promise Easy Access" when Mr. Clark said: "There are more ways to access your money." *Dateline* episode at 31:31-31:34.

- 90 -

*Dateline* Tr. at 8-9; Am. Compl. at 36-37, ¶¶ 105-06.  BCA characterized this excerpt to mean that Mr. Clark taught agents to deceive seniors into believing an annuity is the most liquid place for their money.  Am. Compl. at 37, ¶ 107.  BCA alleged that Mr. Clark never said that "an annuity is the most liquid place a senior citizen can put their money"—as Attorney General Swanson said he did—and that, in any case, Mr. Clark stressed that annuities are not proper for people who want to routinely withdraw funds.  *Id.* at 37, ¶¶ 106, 108.  The seminar recording indicates otherwise.

First, Mr. Clark stated at the seminar that annuities provide the most choices for seniors to access their money.  Rebutting criticisms that annuities are not liquid, Mr. Clark concluded the Statement 8 quote above by saying:

> No other investment or savings vehicle in existence gives you the number of options of accessibility that you have with an annuity. Annuities are not liquid[?]  That is baloney, that's garbage, that is not true. . . .  There are more ways to access your money than any other financial instrument.  So liquidity?  Yes.

Recording Tr. Day 1 at 72-73.

Second, as explained above in our "mislead seniors" and "unsuitable products" gist analysis, Mr. Clark's acknowledgement that "[i]f you're going to put your money in and take it out, put it in and take it out, an annuity is not for you," *id.* at 178, was made to help attendees counter surrender charge criticisms and was quickly dismissed as not relevant to seniors:  "In the real world, they never touch their money.  Seniors put their money in annuities, I'm sorry, but they never touch it.  They never take it out."  *Id.* at 187.  Thus, Mr. Clark taught attendees to dismiss annuity criticisms without teaching that annuities may be improper for some clients.

- 91 -

Third, Attorney General Swanson's comment disputing Mr. Clark's assertion about annuity liquidity responded to Mr. Hansen's invitation to "characterize" what Mr. Clark had said. She expressed her opinion that "he is not telling the truth" that an "annuity is the most liquid place" for seniors to invest.[91] Her comment matched opinions about annuity liquidity that other financial experts expressed during the episode. *See Dateline* Tr. at 1. The episode's inclusion of the attorney general's comment was not actionable.

To the extent her comment asserted a fact that is provably true or false, the asserted fact is that an annuity is not the most liquid investment for seniors. When compared to the seminar, this fact was not materially false under the *Masson/Bustos* standard. As explained above, even Mr. Clark recognized that an annuity can lock up money—despite mitigation options—when he talked about surrender charges. Recording Tr. Day 1 at 186 ("There are some high surrender charges . . . You don't put your money in to take it out, put it in, take it out."). He also thought this feature of an annuity is beneficial for asset preservation. *Id.* ("Surrender charges enables [sic] higher rate of return. It deters people trying to take the money from the client."). Mr. Clark therefore contradicted his own statement about "choices to access your money." With Mr. Clark

---

[91] We also are not convinced that Attorney General Swanson's statement disagreeing with Mr. Clark about annuity liquidity "is a communication that holds an individual up to contempt or ridicule" and therefore capable of defamatory meaning. *Keohane*, 882 P.2d at 1297; *see also Burns v. McGraw-Hill Broad. Co., Inc.*, 659 P.2d 1351, 1357 (Colo. 1983) ("A finding that the language used was defamatory must be predicated on the context of the entire story and the common meaning of the words utilized.").

sending mixed messages about annuity liquidity at the seminar, Attorney General Swanson's statement, compared to the whole seminar, was not materially false under the *Masson/Bustos* standard.

The "not telling the truth" part of the Attorney General's comment, read in context, also meets the requirements for protected opinion. In *TMJ Implants*, we recognized that the Colorado Supreme Court, in determining "how to distinguish a defamatory statement from a protected expression of opinion," has referred to the U.S. Supreme Court's decision in *Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990), and the Restatement (Second) of Torts § 566 (1977) ("Restatement"). *TMJ Implants*, 498 F.3d at 1183. The *Milkovich* Court, drawing from *Hepps*, said "a statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection." 497 U.S. at 20. It also recognized protection for "rhetorical hyperbole," a "vigorous epithet," and "loose, figurative" language, *id.* at 17 (quotations omitted)—"protection for statements that cannot reasonably [be] interpreted as stating actual facts," *id.* at 20 (quotations omitted). Section 566 of the Restatement states: "A defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegations of undisclosed defamatory facts as the basis for the opinion." The *TMJ Implants* panel noted "the Colorado Supreme Court also views the [*Milkovich* and § 566] formulations as congruent." 498 F.3d at 1186 (citing and quoting Colorado cases).

In the episode, Mr. Hansen asked Attorney General Swanson to "characterize" Mr. Clark's statement that "[t]here are more choices to access your money from an annuity

than any other financial investment."  She disagreed with Mr. Clark, responding that "he is not telling the truth"; "[i]t is simply not true."  *Dateline* Tr. at 9.  In context, these expressions were statements of disagreement.  They were not like the newspaper column stating that Mr. Milkovich had "lied at the [judicial] hearing . . . [under] solemn oath," *Milkovich*, 497 U.S. at 5, which implied he had committed perjury, and therefore was not protected, *id.* at 21.  Unlike the *Milkovich* statement, Attorney General Swanson's response was "the sort of loose, figurative" language the Constitution protects.  *Id.*[92]

Here, the *Dateline* episode explained the basis for Attorney General Swanson's comment, stating that annuities may lock money up "for a specified number of years" and that early withdrawal can result in surrender penalties.  *Dateline* Tr. at 1, 9.  It also acknowledged the opposing viewpoint that annuities are legitimate investments for some people, that Mr. Clark was a strong advocate for them, and—immediately before Attorney General Swanson's comment—that there are "some exceptions" to annuities' locking up money for years.  *Id.* at 9.

Attorney General Swanson's response was similar to the statements analyzed in *Underwager v. Channel 9 Australia*, 69 F.3d 361 (9th Cir. 1995).  In *Underwager*, the Ninth Circuit found statements in a *Sixty Minutes Australia* documentary broadcast to be

---

[92] *See also Gardner*, 563 F.3d at 989-90 (explaining that defendant's statements did not rise to the same level of criminal accusations that were at issue in *Milkovich*); *Underwager v. Channel 9 Australia*, 69 F.3d 361, 367 (9th Cir. 1995) (stating that the term "lying" applies to a "spectrum of untruths" and in this case was no more than "nonactionable 'rhetorical hyperbole' . . . used by those who considered [the appellant's] position extremely unreasonable,'" unlike the verifiable assertion of perjury implied in *Milkovich* (alteration in original)).

non-actionable opinion after examining the "totality of the circumstances in which [they were] made." *Id.* at 366. Like the *Sixty Minutes* episode in *Underwager*, "the format of the [*Dateline*] Program is an exploration of both sides of controversial topics and individuals. [Mr. Clark, through his lawyer,] was given a chance to respond to his critics, but he declined to be interviewed for the program." *Id*. at 367.

Because Attorney General Swanson's comment contained loose, figurative language, and was based on facts presented to the viewer in a context of opposing viewpoints, it was protected opinion. *Id.*[93] The Defendants cannot be held liable for including a state attorney general's statement that disagrees with Mr. Clark about the relative liquidity of annuities.

* * * *

Statements 9 and 10 were not materially false, and Attorney General Swanson's comment was also protected opinion.

### i. *Statement 11*

The episode next discussed an "underground industry" that helps agents "puff up their credentials and mislead you about who they really are." *Dateline* Tr. at 9. The episode showed hidden camera footage of Annuity University speaker Richard

---

[93] *See Riley v. Harr*, 292 F.3d 282, 291-92 (1st Cir. 2002) (finding assertion that plaintiff was lying to be protected opinion where basis for the opinion was disclosed and both sides of the issue were exposed); *see also Gardner*, 563 F.3d at 988-89 (same); *Underwager*, 69 F.3d at 366-67 (concluding speaker's statement that the plaintiff was lying was protected opinion because the speaker made the statement in the context of an investigative broadcast program, took the opposite side of the issue from the plaintiff, and used rhetorical language).

Duff with voiceovers explaining that an agent can pay to have his or her name on the cover of a financial book:

> *Mr. Hansen:   At Annuity University, this ad says you can be the author of a book called "Alligator Proofing Your Estate."   Apparently, agents like the idea of pretending to be authors, because Dateline found copies of the same "Alligator" book supposedly co-written by Jeffrey D. Lazarus, Steven Delott, and Ronald and Robert Russell.*

*Dateline* Tr. at 9; Am. Compl. at 39-40, ¶ 111.  BCA alleged that agents never pretended to be the "sole authors" of the book and that the book is "not ghost-written or misleading to readers in any way."  Am. Compl. at 39-40, ¶ 111.  Rather, the seminar taught legitimate methods for establishing credibility.  *Id.* at 40, ¶ 114.

As explained in the "mislead seniors" gist analysis above, the seminar recording shows Annuity University promoted the use of misleading credentials through ghost-written articles and paying for placement as a book author or radio show guest.  Even though the seminar taught other legitimate methods for establishing credibility, as BCA contends, this does not show Statement 9 is materially false.  *See Machleder*, 801 F.2d at 55 (declining to hold media defendant liable for truthful statements where additional facts would have cast plaintiff in a "more favorable" light).  BCA's alleged difference between being a paid "sole author" and a paid co-author—as the episode describes—is a "[m]inor inaccurac[y]" at most and is also insufficient to render the statement materially false.  *Masson*, 501 U.S. at 517.

Statement 11 was not materially false.

j. *Statement 12*

BCA's amended complaint alleged that a false and defamatory preview of the *Dateline* episode aired on *The Today Show* ("Preview").[94] The Complaint described the Preview as follows:

> During the Preview, *Today Show* host Meredith Viera ("Viera"), posed the following question to viewers: "Are [seniors] being tricked out of their hard earned money . . . by deceptive sales practices?" Viera then proceeded to answer the question by playing a voiceover narrative of Hansen describing the program while images of an allegedly deceived senior were presented to viewers followed by hidden-camera images of Clark while speaking in the October 2007 classes. While showing these images, Hansen asked: "Are some agents being coached on how to mislead people when they sell annuities?" . . . The Preview then showed images of Minnesota Attorney General Lori Swanson stating that Clark's statements during the secretly taped sessions of Annuity University are a "lie."

Am. Compl. at 22-23, ¶ 67 (emphasis omitted). BCA alleged that the preview conveyed that "Clark teaches insurance agents how to mislead and exploit people when they sell annuities," *id.* at 23, ¶ 68, but Mr. Clark never taught attendees how to scare or mislead seniors and instead stressed honesty and sincerity, *id.* at 23, ¶ 69. BCA also alleged that the edition of the "Alligator" book displayed in the Preview had not been marketed at Annuity University for over five years and that the agent's

---

[94] Statements 1-11 are direct quotes from the *Dateline* episode alleged to be false and defamatory. Statement 12 comes from *The Today Show* Preview, rather than the episode itself. Because BCA similarly alleged that the Preview is false and defamatory, we quote the Preview description as it appears in BCA's amended complaint. Am. Compl. at 22-23, ¶ 67. Because the parties have not provided a copy of the Preview, or a transcript of its content, we accept BCA's description as accurate.

chapter in the book was clearly delineated, so the book was not ghost-written. *Id.* at 24, ¶ 71.

Our analysis of this statement tracks our gist analysis and our resolution of Statements 6 and 11. BCA's allegation regarding the "Alligator" book is insufficient to render the statement materially false. Because the seminar marketed ghost-written articles and paid authorship opportunities, the book version used in the preview is a "[m]inor inaccurac[y]" at most and is therefore not actionable. *Masson*, 501 U.S. at 517. Because Mr. Clark taught the use of scare tactics and misleading seniors, Statement 12 was not materially false.

## IV. **CONCLUSION**

For the foregoing reasons, we affirm the district court's dismissal.[95]

---

[95] Because we affirm the district court's dismissal, we deny as moot BCA's request for a new trial judge on remand.

 **MSNBC.com**

## Tricks of the trade

A Dateline hidden camera investigation sees what insurance agents say -- and what they don't -- when they think they are alone with a senior
TRANSCRIPT
By Chris Hansen
Correspondent
updated 11:03 a.m. ET, Wed., April. 23, 2008
This story originally aired Dateline NBC on April 13, 2008. Hidden camera dialogue is in italics.

America's seniors have always been a sales target -- now more than ever, because they control more than $15 trillion.

In an effort to get a slice of that pie, some independent insurance agents, representing big insurance companies, are selling a relatively new kind of investment to people like Leo Stulen.

**Leo Stulen:** Here, you know, they're selling something to somebody who's got one foot in the grave and the other one on a banana peel.

When he was 72 years old, Leo bought something called an "equity indexed annuity." It's a legitimate investment for some people, and sales have soared because insurance companies market them as a safe place to put your money.

What are they? They're called "indexed" because they're tied, in part, to the stock market. If stocks go up, you gain some.

But the best part is if stocks go down, the insurance company guarantees you won't lose.

**Leo Stulen:** It would never get lower than what it was right then.**Chris Hansen:** You could never lose money?**Leo Stulen:** Never lose.

And they're called "annuities" because they're really insurance contracts. You pay a premium and the insurance company promises to make payments to you in the future.

But there are two important things Leo Stulen says he wasn't told, things that some experts say make this a horrible investment for many seniors.

First, the annuity would lock up most of his money for more than a decade, which is longer than he might live.

And, what's worse, if he needed to withdraw his cash early, he would pay stiff surrender penalties.

And that's exactly what happened when his wife had a medical emergency.

**Leo Stulen:** They say, "Well, if you draw it out early it's a substantial penalty." And I say, "Oh." We got took.

At the time, Leo Stulen had about $40,000 in the annuity -- his entire life savings. And because of the surrender penalty, he lost 15 percent of it, or $6,000. He got back less money than he put in.

He says the loss forced him to sell his home.

**Leo Stulen:** There's times where -- what are we going to buy? Pills or food? Because we were short of money.

He's not the only senior who's heard the pitch.

Dateline is about to show how some insurance agents can take advantage of you.

Join us in a ground-breaking hidden-camera investigation, as we go behind the scenes to uncover the techniques they use: inside sales meetings -- where we catch the questionable pitches; inside training sessions -- where we discover agents being taught to scare seniors; and, finally, inside senior's homes to reveal the tricks some agents use to puff their credentials to make a sale.

You're about to see what happens when we catch them in the act.

Leo Stulen says he was tricked into signing away his life savings.

They're so greedy to get that almighty dollar because they're going to make a big commission that they'll do anything to get it.

For Leo, it all began at a free seminar that offers tips on how to protect your retirement nest egg. Some seminars provide useful information, but authorities say that too often, instead of simply calling themselves "insurance salesmen," the people giving them cloak themselves in fancy titles. Some even claim to have written books or magazine articles.

*(Hidden camera)"The cover story is an interview with Randy. "***Joe Borg:** The idea is nothing more than trying to convince the public that you're something you're not.**Chris Hansen:**  Financial advisor.**Joe Borg:** Senior wealth advisor, I've seen them all.

Joe Borg is one of the experts who testified at a recent senate hearing on questionable sales to seniors. Borg is Director of the Alabama Securities Commission and part of a multi-state task force investigating the possibility of fraud in the sale of retirement investments to seniors.

Dateline is about to take our hidden cameras inside some of those the seminars -- and we'll be asking Joe Borg to help evaluate the sales pitches.

**Inside the sales pitch**
It's a Thursday night at the local steakhouse in Moulton, Ala.

*(Hidden camera)Jim Rieger: Hey, how you doing?Dateline NBC: Hello, how are you?Jim Rieger: James Rieger ...*

This insurance salesman has invited retirees and people approaching retirement to an informational seminar.

And as bait, Jim Rieger is offering everyone who attends a free steak dinner.

*(Hidden camera)Waitress: And what side would you like? We have fries, baked potato, onion rings, rice, or veggies?*

But before we're served, there's Jim's low-key presentation.

*Rieger: So there's a lot of bad advice going around...*

He begins by saying he's just trying to help you. He's not selling anything at the meeting tonight.

*Rieger: I have no agenda when I see people...*

Too often, Joe Borg says, that's just a come-on to set up a face-to-face meeting.

**Borg:** The only reason they do free lunches, free dinners, free seminars is to sell product. The agenda is: buy my product.

**The first step: scare tactics**

*(Hidden camera)Rieger: Did anybody ever do a check on the financial strength at FDIC?*

Jim Rieger warns that money in the bank isn't as safe as you think.

He questions the stability of the government agency that guarantees bank accounts, the FDIC.

*Rieger: Does anybody have a guess what the rating is for FDIC? ... Even though it's backed by the government, it's still F-minus.***Chris Hansen:** Did you realize that our own government, FDIC, was rated F-minus?**Joe Borg:** I had no idea.**Chris Hansen:** Is that a scare tactic?**Joe Borg:** Of course it's a scare tactic.

Dateline checked, and there is no such rating. And the fact is: no one has even lost a dime on FDIC-insured deposits.

**The next step: the big promise**

*Rieger: There's another type called an equity-indexed annuity. It's that ratchet annuity concept.*

Jim Rieger says he has a way to make your money go up, up, up. It's called an indexed annuity.

Remember, that's the same kind of annuity Leo Stulen bought back in Minnesota. They're sold by insurance companies, and linked to the stock market.

And unless you pay stiff surrender penalties, they tie up most of your money for years.

That's why Jim Rieger warns: you don't want to put too much money in what he calls "ratchet" annuities.

*Jim Rieger: You all know how ratchets work, right? They only go one way, don't they?*

**Finally: the clincher**

You can't lose a dime.

*Jim Rieger: As the market grows in this kind of annuity, your account grows, all right? If the market goes down ... Aren't your funds insured? Well, they are. So if the market collapses, your account never goes down ...*

That's true, if you keep your money invested for the length of the annuity, which invariably means years.

But Joe Borg says people can lose big if you have to take your money out early.

**Joe Borg:** They would pay the surrender charges, which could be 10, 15, 18 percent. And basically they would come out with less than they put in.**Chris Hansen:** Less than what they put in?**Joe Borg:** Oh, absolutely.**Chris Hansen:** Would you recommend one of these to your mother?**Joe Borg:** I wouldn't. I wouldn't recommend them to anybody.

If you read -- and understand -- the fine print in annuity contracts, you'll find out about surrender penalties.

But many of us rely on salesmen, like Jim Rieger, to explain things.

The question: will he be honest about those big penalties when he's alone with a senior?

To find out, Dateline rented a house in a small town near Birmingham, Alabama .. And began wiring it with hidden cameras.

We ask a volunteer in his 70's to listen to the sales pitch, and we invite Jim Rieger to make a house call.

*(hidden camera)James Rieger: I don't really sell anything at all. I'm not here for an agenda ...*

He says he's not here to sell, but it doesn't take long before he starts talking up those equity-indexed annuities that could earn him big commissions.

*Rieger: So, this is one of those perfect things where if the market goes up, it soaks up the gains. If the market crashes, your asset still remains here.*

There's plenty of talk about what you can gain, but the key question is: will he tell us about those big surrender penalties if you try to get your money out early?

Our volunteer is about to ask.

*Leon Morris: What if I get in a jam, or let's say I have a lot of medicine expenses.James Rieger: You can dip in and take more.Leon Morris: Or if I need a cash—James Rieger: You can take more.*

There's no mention of big penalties.

But before we can ask more questions, something happens that we never imagined.

*James Rieger: What is this little box here?Leon Morris: Damn, I don't know.*

One of our hidden microphones has been knocked loose.

*James Rieger: It's kind of weird. It dropped off. Coffee table. That's weird. I've never seen one.*

We've been made.

Whatever he thinks the microphone is, he decides to leave before we get a chance to ask any tough questions.

Later, his lawyer told us Rieger always gives a full explanation of surrender penalties before he completes a sale.

More independent insurance agents are arriving at the sting house we've set up outside Birmingham, Ala.

Some of them seem honest and tell our senior volunteer he should stay away from so-called "equity indexed annuities."

*Cecil Cheney: In my heart, I wouldn't buy one. So I can't sell them.*

That's because experts say putting your life savings in indexed annuities can be a bad deal for seniors, because they lock up most of your money for years.

And if you need your cash early, you pay surrender penalties so big that you can wind up with less money than you put in.

But almost as often we meet agents eager to sell them -- like this man, Rickey Gibbs. He claims annuities are safer than stocks because you can't lose money.

*(hidden camera)Rickey Gibbs: They drop the bomb or they blow up some building, it can kill you on the mutual funds. But you can say, "Well, (knocks on wood) I am not going to lose."*

Protecting your life savings in a troubled world. That's the main selling point.

But will he be honest about those big surrender penalties?

*Leon Morris: Is there any penalty on that withdrawal?Rickey Gibbs: No. No. Not unless you take out 10 percent.*

With this annuity, after the first year, you can withdraw some of your money -- 10 percent annually -- without a penalty.

But the salesman doesn't say how big the penalty is if you need the rest of your money.

When we invite him back for a second meeting, he mentions the penalty again -- but still doesn't say how much you'd have to pay.

*Leon Morris: Well, supposed I needed to get some money out?Rickey Gibbs: You'd have some penalties involved. Because see? They're charging nothing to do this.*

Instead of telling us the surrender penalty starts at 16 percent in the first year, he changes the subject to health insurance.

*Rickey Gibbs: But I've got something, too, that we need to talk about also. That would insure that. And that is a long term care.*

We'd seen enough.

*Chris Hansen: Oh, hey, Leon.Leon Morris: Oh, hey, Chris.*

Rickey Gibbs doesn't know yet that I'm a reporter, or that he's being recorded on hidden cameras.

I just act like I'm Leon's friend, and want him to make a wise investment.

*Chris Hansen: Now, let's say there was something catastrophic and he had to get his hands on some of that money. What kind of penalties would be incurred?Rickey Gibbs: What I was telling him is we don't want to put too much in it.*

Although he warns against tying up too much money in an annuity, remarkably, Rickey Gibbs avoids telling us how big the penalties are.

And changes the subject again.

*Chris Hansen: So, what you're saying is don't worry about the penalties on taking money out of the annuity.Rickey Gibbs: Right.Chris Hansen: Just buy yourself a couple more policies.Rickey Gibbs: The factor in enough to take care of--Chris Hansen: Get more insurance-- Basically is what you're saying.Rickey Gibbs: Yeah.*

I have to ask three times --

*Chris Hansen: I know I'm sounding like a broken record*

-- before I finally get a straight answer about the big penalties.

*Chris Hansen: Well, here's a question. It's Rickey, right?Rickey Gibbs: Right.Chris Hansen: Why not just be up front and straight with people from the get go and say, "Look, if you got to touch the money, it could cost as much as 16 percent or more?" Why not just tell them? I mean, why not?Rickey Gibbs: I--Chris Hansen: If it's such a great product, then why not tell them.*

*That's not what you said up front.Rickey Gibbs: No, it's not. It's not. It's not.Chris Hansen: You're a little dodgy there.Rickey Gibbs: Well, I didn't mean to be. I really didn't mean to be.Chris Hansen: But you see what I'm getting at?Rickey Gibbs: I see what you're getting at.*

Rickey Gibbs says he didn't intend to mislead anyone.

*Chris Hansen: Yeah. Well, Rickey, there's something I've got to tell you.Rickey Gibbs: All right.Chris Hansen: That you may not know. I'm Chris Hansen with Dateline NBC and we're doing a story on the practices of people who sell this financial product.Rickey Gibbs: Right.***Chris Hansen:** And if there's anything else you want to tell us about this--**Rickey Gibbs:** I'm not--**Chris Hansen:** We'd like to hear.**Rickey Gibbs:** I mean, I don't-- I haven't done that I thinks wrong.

But before he leaves, Rickey Gibbs has a few choice words for us.

**Rickey Gibbs:** And, I think what you've done is awful. I mean, you've just--**Chris Hansen:** What I've done is awful?**Rickey Gibbs:** Yeah, what you've done is awful.**Chris Hansen:** There was not a lie here sir.**Rickey Gibbs:** I say that you're a liar because you didn't tell me what you were doing and who you are.

He's upset we didn't tell him we were from Dateline when we first invited him to the house.

**Rickey Gibbs:** I think that's crazy. I guess we're done.**Chris Hansen:** OK.**Rickey Gibbs:** We'll see you.**Chris Hansen:** Thank you for your time.**Rickey Gibbs:** Thank you for being such an a--hole.**Chris Hansen:** That's nice talk...

We've seen some of the tactics insurance agents use to sell to seniors. The agents seem awfully slick. How did they get so good?

You are about to witness something few people have ever seen -- a school where, authorities say, insurance salesmen are being taught questionable tools of the trade.

These training sessions are only open to licensed insurance agents.

We don't know whether the salesmen we've met so far studied here, but the state of Alabama agreed to help us investigate by issuing insurance licenses to two Dateline producers, so we could attend -- and bring along our hidden cameras.

*(hidden camera)Tyrone Clark: Annuities are not liquid? That is baloney ...*

This is the man in charge of "Annuity University" -- Tyrone Clark, the self-proclaimed king of annuity sales.

Annuities are legitimate investments for some people, and Clark is a strong advocate for them.

He says they're safe and have no risk, which are selling points especially appealing to seniors.

*(hidden cam)Tyrone Clark: What I sell in peace of mind ...*

And for the next two days, he'll be giving motivational speeches and traditional sales tips.

*Tyrone Clark: I have trained more millionaires in the annuity industry than anybody in America ...*

But what else is Tyrone Clark teaching?

In 2002, the state of Massachusetts accused Clark and his companies of a "dishonest scheme to deceive, coerce and frighten the elderly."

Part of the evidence was the training manual in which Clark tells agents to sell to seniors by assuming they're "selling to a 12-year-old" and by hitting their "fear, anger or greed buttons."

Clark settled that case without admitting any wrongdoing.

And, now, his company says it's become "an industry leader" in promoting ethical conduct.

But watch what our hidden cameras found, and see if you agree.

Remember those scare tactics?

*(hidden camera)Tyrone Clark: And I'm bringing these things up that disturb the hell out of them.*

For Tyrone Clark, disturbing people seems to be Annuity Sales 101.

*Tyrone Clark: I bring out the stuff that-- where they can't sleep at night.*

And how do you do you make them worry?

One way is to suggest their money may not be safe, even in a bank, by telling a potential client something like this.

*(hidden cam)Tyrone Clark: FDIC is insolvent. FDIC only has $1.37 per every $100 on deposit.*

Another way is to mention a senior's natural fear of nursing homes.

*(hidden camera) Tyrone Clark: I help my clients to protect their life savings from the nursing home and Medicaid seizure of their assets. See, that's scary, and it should be scary.*

The next step?

Promise people easy access to their money.

Even though, with some exceptions, annuities lock up most of your money for a specified number of years, listen to the sales pitch Tyrone Clark suggests.

*Tyrone Clark: There are more ways to access your money. There are more options. There are more choices to access your money from an annuity than any other financial instrument.*

We asked Minnesota Attorney General Lori Swanson to watch what our hidden cameras had captured.

**Chris Hansen:** How would you characterize what this man has said?**Lori Swanson:** I think that he is not telling the truth when he tells those agents that an annuity is the most liquid place a senior citizen can put their money. It is simply not true.

For example, if you put your money in a savings account at a bank you could withdraw it at any time. But that's not all that goes into convincing seniors to buy.

You have to make sure they believe you know what you're talking about -- that you have credibility.

At Annuity University, Dateline discovered part of an underground industry that helps insurance agents puff up their credentials and mislead you about who they really are.

*(hidden camera)Dateline: Which are the books that we can write with you? Richard Duff: This one.*

Want to look like a respected author?

This man will let you put your name on the cover of one of his financial books.

All you have to do is write a short biography.

And oh, by the way -- give him a few thousand dollars.

*Dateline: Instead of just your name.Richard Duff: We'll put the three of us on here.Dateline: Isn't that cool? Richard Duff: It is good. And it's your first chapter, there's room for five or six, seven pages, all about the way you're looking at things, and phone numbers, contact information.*

He's not alone.

At Annuity University, this ad says you can be the author of a book called "Alligator Proofing Your Estate".

Apparently, agents like the idea of pretending to be authors, because Dateline found copies of the same "Alligator" book supposedly co-written by Jeffrey D. Lazarus, Steven Delott, and Ronald and Robert Russell.

Want to sound like a respected financial expert on a nationally syndicated radio show?

At Annuity University, you can buy that too.

*(hidden camera)Jeff Hoyle: Response radio is a pre-scripted radio show, for lack of a better word.*

This trainer is explaining how, for a price, an insurance agent can pretend to be a guest on the radio.

They'll send you the script, already written.

Then, the radio host will call and record you.

*Dateline: And Rick would interview us?Jeff Hoyle: Yes.Dateline: On the show?Jeff Hoyle: Yes. Yes. You are like the interview-- you are like the guest speaker on "Senior Concerns" talk show.*

And, before long, you'll be armed with CDs of your guest appearance to help impress customers.

Tyrone Clark says it's all part of the formula for selling annuities.

But Attorney General Swanson says tactics like that can lead to abuse.

**Lori Swanson:** He is basically handing them loaded guns so they can walk into the senior's home and rip them off.

The insurance agent you're about to meet isn't just any salesman.

He's a proud graduate of "Annuity University," the seminar program in Colorado run by Tyrone Clark.

That's where Dateline's hidden cameras found salesmen being trained how to sell annuities.

In this internet testimonial, Bill Denny credits his success to Tyrone Clark's sales secrets.

*Bill Denny testimonial: They have helped me to be a tremendous success in the fixed annuities business.*

Now, Denny and his assistant are sitting down in a house in Arizona we've wired with hidden cameras -- and he's about to give his pitch to my own aunt Alice.

*(hidden camera)Bill Denny: Everything I do must benefit you.*

Aunt Alice has volunteered to help me find out if insurance agents will level with a widow in her 70's when they try to sell so-called equity-indexed annuities.

*Bill Denny: All I really do anymore are called EIAs. That stands for equity indexed annuity.*

Remember, even though they're pitched as "can't lose" investments, experts like Alabama Securities Director Joe Borg say there are important reasons seniors should think twice before putting their money in indexed annuities.

**Borg:** You're locking in your money. You can't get it out exactly when you want it. There's high surrender fees if you need it.

The question: will the salesman warn us about all of that?

Bill Denny's sales pitch begins with a laundry list of fancy-sounding credentials.

*Bill Denny: I've been to the Institute of Elder Planning Studies, a Certified Annuity Counselor, a member of the Society of Senior Market Professionals ...*

And before long, it seems like a flash-back to what we heard at Annuity U.

Remember that scare tactic about banks and the FDIC being in trouble?

*(hidden camera)Tyrone Clark: Because FDIC is insolvent. FDIC only has $1.37 per every $100 on deposit.*

Bill Denny is about to repeat it.

*Bill Denny: As we're sitting here talking, in real cash on hand they have a $1.02 for every $100 deposit in America. And that's it. And they can take 10 years to pay you back.*

It's true that FDIC only keeps enough reserves on hand to cover projected bank failures.

But remember, Dateline checked. Nobody's ever lost a dime on an FDIC-insured account.

And it's paid off in days, not years.

*Tyrone Clark: Annuities are not liquid? That is baloney ...*

Remember how Tyrone Clark taught agents how to promise seniors they'd have easy access to their money?

Bill Denny makes the very same pitch.

*Bill Denny: Annuities have more liquidity than CDs.*

But the key test is: will Bill Denny be honest and make sure my aunt Alice understands the size of those surrender penalties?

*Alice Grace: God forbid if my grandson was in a terrible accident and they couldn't cover all the expenses or something, you know what I mean? I'd want to be able to help out on something like that?*

Aunt Alice is asking about taking her money out in an emergency.

It's a simple question really.

And it has a simple answer. He could say: "Yes ma'am, it's costly to take money out early. You'd lose a bundle."

But instead of saying that, Bill Denny gives an answer that's muddled with information about taxes and IRAs.

See if this is clear to you.

*(Hidden camera)Bill Denny: Well, the thing is, of course, if you pull a big lump sum out you're going to have a big tax bill anyway.Alice Grace: Oh.Bill Denny: You know, it's all taxable. That's-- you never paid taxes on IRA money. But there's a depreciating surrender period right here, because you're under 80. But it goes for 16 years. It starts at 20 and ends up at zero.*

Did you catch it?

The information is in there. The annuity he's pushing has a 20-percent surrender penalty.

But here's how fast it goes by.

*Bill Denny: It starts at 20 and ends up at zero.*

Minnesota Attorney General Lori Swanson says people deserve clear explanations.

**Lori Swanson:** It's absolutely misleading. I mean, really, they need to deal with these seniors straight.**Chris Hansen:** But to be fair, he did show her the brochure and the sliding scale of what the penalties would be.**Lori Swanson:** Yeah, he kind of he did. But it was pretty quick. And he's saying "sliding scale." And then the whole time he's talking tax talk. The tax issue has nothing to do with what she's asking.

When Bil Denny returns the next day, hoping to close the deal, I decide it's time to ask some questions of my own.

*Chris Hansen: Hello ... Alice Grace: Come on in ... Chris Hansen: What's happening?Alice Grace: Oh, good. This is a gentleman--Bill Denny: Hi, Bill Denny. Nice to meet you.*

Bill Denny doesn't know I'm a reporter yet, or that we're recording with hidden cameras.

*Chris Hansen: Listen, you know, her husband died not long ago. This may not seem like a lot of money to you, but it's all she has.*

As I start pushing for answers, I have an advantage: I'm not a senior (yet), and I already know the right questions to ask.

Like: how long will Alice's money really be tied up?

*(Hidden camera) Chris Hansen: And that goes on for how many years before she could access the whole--Bill Denny: Until the money ran out. Chris hansen: No, no, no. When would she have access, again, to the full pot of money?Bill Denny: Oh, the surrender period over?Chris Hansen: Yeah.Bill Denny: It's a 16-year surrender period.Chris Hansen: Sixteen years.*

It turns out that Alice's money will be tied up for 16 years.

And what happens if she has to take her money out early?

I ask Bill Denny about some of the fine print I'd spotted in his brochure.

*Chris Hansen: "Minimum guaranteed surrender value. MGSV fee equals 80 percent." Explain that to me. What does that mean?Bill Denny: Well, she can--she could end up losing. Well, here, let's look at the surrender charge...*

Bill Denny just admitted Alice could lose money.

And he's pulling out the same table he glossed over the day before.

*Bill Denny: That's because she did it in the first year, there's would be 20 percent the first year.Chris Hansen: OK. So that's what I'm getting at. So she needed to get at this cash, right? She would face in the first year a 20 percent--Bill Denny: Well, if she ever took it out before the anniversary, that would be crazy.Chris Hansen: But I still need to ask you, when Alice was talking to you yesterday, every time she'd ask about what she had to go through if she needed to get her hands on that money, you sort of didn't get right to that 20 percent surrender penalty.Bill Denny: Well, I said this is why I left this with her. I said "Look through here."*

Leaving the brochure, he says, is good enough.

Alabama's Joe Borg doesn't see it that way.

**Chris Hansen:** Isn't it up to the person buying these products, even if they are elderly, to read all the fine print, if in fact they're going to invest, potentially, their life savings?**Joe Borg:** I don't think I've ever met anybody who's even read the loan documents on their loan for their houses, let alone the person you trust sitting across the table who has told you, "Trust me. I'm here working for you. I'm a senior financial advisor. Trust me. Sign here."

But when it comes time to tell bill Denny who I really am, it's my turn to be surprised.

**Chris Hansen:** Well, there's something I got to tell you, Bill, and that's I'm

Chris Hansen. And I'm with Dateline NBC.**Bill Denny:** Really?**Chris Hansen:** --doing a story on sales technique--**Bill Denny:** You know what? **Chris Hansen:** --when it comes to financial--**Bill Denny:** They just called me on Monday.**Chris Hansen:** Who did?**Bill Denny:** The Denver office called me on Monday and said Dateline NBC is doing an expose on agents.**Chris Hansen:** Oh, is that right?**Bill Denny:** Yes.

Apparently word is spreading about our undercover sting.

In fact, you may be surprised to hear that Bill Denny thinks it's a good idea.

**Chris Hansen:** And you understand why we'd be doing a story about this?**Bill Denny:** Absolutely. Absolutely. And actually, I actually have to be honest with you and agree with what you're doing because I don't want bad apples out there doing things the wrong way.

Bill Denny warns us that there are plenty of bad apples, but he's not one of them.

**Bill Denny:** Well, I believe this was totally upfront and truthful. I didn't mislead her in any way.

Bill Denny says he's never had a customer complaint in 15 years of doing business.

And, ever the salesman, he shows just how determined he is to make a sale.

**Bill Denny:** So are we going to move the money? **Chris Hansen:** Not just today.

Later, his lawyer told us that because we limited the time he could spend with Aunt Alice, Denny tried to pack his normal 3-hour sales pitch into 45 minutes.

If he'd had more time, Denny says, he would have given a full explanation of annuities - including those surrender penalties.

There is a phone call to the insurance giant Allianz, complaining about Robert Bradford.

Records show there are more than a dozen law suits pending against Bradford, all accusing him of misleading people when he sells so-called "equity indexed annuities" -- a type of investment that locks up most of your money for years.

Bradford denies misleading people.

But we wondered: what would he tell one of our senior volunteers?

*(Hidden camera)Bob Bradford: The new kid on the block is what's called indexed annuities ...*

Bob Bradford thinks he's alone, but Dateline's hidden cameras are capturing his every word.

Bradford warns you shouldn't put money in if you plan to take it out early.

But remember, the key question is: will he be honest about the size of those surrender penalties if you do need the money.

*Leon Morris: What happens if during the course of this thing I need to take out $50,000?Bradford: OK. All right.Leon Morris: I mean, how does that work?Bradford: That would dip into it. And then you can do that. It's just like a CD. They would have a penalty for early withdrawal on anything over that 10 percent amount.*

Bradford makes the penalty sound small,like a certificate of deposit at a bank.

Minnesota Attorney General Lori Swanson says that's clearly deceptive.

**Lori Swanson:** It's absolutely not a fair comparison. They're like night and day.**Chris Hansen:** If I cash in a CD early, basically I lose some interest. What happens in I try to cash in early on an equity indexed annuity?**Lori Swanson:** You lose your principal. You lose your original money.

Here's an example.

If you withdraw a $100,000 CD early, you lose interest -- but get all of your $100,000 back.

If you withdraw a $100,000 annuity, with a 10 percent surrender penalty you'd only get $90,000 back. And you'd lose the interest.

But we're about to discover that's not the only thing Bob Bradford is deceptive about.

Remember, he could make thousands of dollars in commissions on a sale.

So, he reaches into his bag of tricks and shows our senior volunteer a magazine where he's featured on the cover, along with the chairman of the federal reserve.

*Bradford: You remember who Bernanke is? Ben Bernanke who--Leon: I seen him on the television ...Bradford: Yeah. That's me right there.*

Bob Bradford makes it sound like it's a big honor, something that made his mother proud.

*Bradford: So my mother was -- this is the first time I'd ever been on the cover of the Rolling Stone, so to speak.*

But wait a minute. Haven't we seen that same magazine before...

*Agent: Some of you may have seen financial playbook magazine*

... with a different agent on the cover?

*Agent: Federal reserve chairman on the cover. Also, the cover story is an interview with Randy.*

How could two different agents be featured on the cover of the same magazine?

Dateline discovered: if you're an insurance agent, it's easy.

All you have to do is go online to a special Web site, pay "Financial Playbook" several thousand dollars, pick a ghost-written article (I chose number #42, about annuities), and send in a picture (I used an old one of myself).

And before long, there I am on the cover of the new issue as a "Senior Advisor."

We showed what we discovered to Minnesota attorney general Swanson.

**Lori Swanson:** Boy, that-- this is part of the marketing ploy. Build trust, show you're reputable.**Chris Hansen:** Then we found that for $1,500, we could get the magazine with my picture on the cover.**Lori Swanson:** That's terrible. And you've captured it on tape, absolutely what we're hearing in all of these cases and investigations that we're bringing -- that these agents are not telling the truth.

When Bob Bradford returns to talk to Leon and try to close the sale, I decide to step in.

I haven't told Bradford I'm a reporter, yet, but he may be on to us because, suddenly, I'm getting answers our senior volunteer never heard.

Remember how he made those surrender penalties sound small, like CDs? Not anymore.

*Chris Hansen: But let's say he had to get at some of this cash.Robert Bradford: Yeah.Chris Hansen: What would the penalty be?Robert Bradford: In the first year it starts out at 16 percent.*

A 16 percent penalty?

Our volunteer never heard that number during the sales pitch.

And remember that fake magazine Bob Bradford used to impress Leon?

It's time to show him what we found.

*Chris Hansen: I found that magazine, that very same magazine, with a different agent's face on it.Robert Bradford: Yeah, yeah.*

At first, Bob Bradford acts like there's nothing wrong.

*Chris Hansen: Now the reality is this, Bob. I looked around and I checked. And I contacted this outfit, and for $1,500, they put me on the cover.Robert Bradford: All right.Chris Hansen: What did you pay to have your picture on-- Robert Bradford: Oh, I don't remember.Chris Hansen: You don't remember? Robert Bradford: Oh no.Chris Hansen: But you didn't write that article, did you?Robert Bradford: No.*

It's time to tell Bob Bradford he's been caught in the act by Dateline's hidden cameras.

**Chris Hansen:** I'm Chris Hansen, with Dateline NBC.**Robert Bradford:** Oh, OK.**Chris Hansen:** And we're doing a story on questionable practices of insurance salesmen who sell financial products to the elderly. And if there's anything else you'd like to tell us about your dealings with Leon or with anybody else, we'd certainly like to hear it.**Bradford:** No. You don't put money in these things and turn around and take them out.

Bob Bradford denies he did anything wrong. And Financial Playbook told us they didn't know agents were using the magazine to puff up their credentials.

Bradford says he wasn't trying to mislead anyone, that he gives a full explanation of surrender penalties before he completes a sale, and he blames those lawsuits on plaintiff's lawyers advertising for clients.

But remember that complaint call about him to Allianz, the nation's biggest seller of indexed annuities?

In spite of customer complaints like that and a growing number of lawsuits alleging fraud, Alllanz was one of the companies Bob Bradford was still selling for when he came to visit us.

*Bradford: Mostly we're using a company out of Minneapolis called Allianz ...*

Last year, Attorney General Swanson sued Allianz and several other insurance companies, claiming they "failed to properly supervise" agents and encouraged deceptive and misleading sales practices.

**Bhojwani testimony:** ...annuities play a vital role for seniors ...

Insurance giant Allianz defends its products and says it's cracking down on salesmen.

Just last month, it terminated its relationship with Bob Bradford -- and no longer permits him to sell its products.

The president of Allianz declined an interview with Dateline, but he told a recent senate hearing he's implementing new safeguards to prevent deceptive sales techniques.

For example, he's started follow-up phone calls to seniors from the main office.

**Gary Bhojwani:** Allianz employees will call every fixed annuity purchaser aged 75 or older to go through the features of the product with them and to be certain that those features are understood.

And what about Tyrone Clark, the man who claims to teach Insurance agents how to make millions selling annuities?

*Tyrone Clark: That's fear. The presentation should have that impact.*

Turns out, he doesn't want to talk to me about the lessons Dateline caught on hidden camera.

When I went to Clark's office, a lawyer met us in the parking lot and told us to leave.

**Chris Hansen:** There are some things that go on at the seminar that we'd like to ask you about. **Raymond Jones:** Thanks, but no thanks.

In a series of letters, Tyrone Clark's lawyers said:

- that the quotes we used from Clark's seminar were not "in full context"
- that Clark teaches agents to be "honest, ethical, and service-oriented"
- and it's the "duty" of an insurance agent "to present the facts, both pleasant and unpleasant, to customers"

They also said Dateline used an "unethical series of deceptions" by going undercover and using hidden cameras.

**Leo Stulen:** I'd been better off just to put it in the bank downtown.

For Leo Stulen, the man who lost thousands of dollars when he had to cash in an Allianz annuity early, there is some good news.

As part of a settlement with Attorney General Swanson, Allianz has agreed to pay restitution without admitting wrongdoing.

It means Leo and thousands of other Minnesota seniors who claim they were cheated will get a refund, plus interest.

Other lawsuits are pending against Allianz and other insurance companies nationwide.

**Chris Hansen:** What do you say to other retired folks who may be thinking about investing in an equity indexed annuity?**Leo Stulen:** Don't.

© *2008 msnbc.com  Reprints*

URL: http://www.msnbc.msn.com/id/24095230/

MSN Privacy . Legal
© 2008 MSNBC.com